**ARMOUR AND COMPANY, Petitioner,**

v.

**UNITED STATES of America and Orville L. Freeman, Secretary of Agriculture, Respondents.**

No. 16285.

United States Court of Appeals
Seventh Circuit.

Oct. 17, 1968.

Thomas F. Daly, Herbert Brownell, Thomas R. McMullin, New York City, Donald R. Kanzler, Chicago, Ill., for petitioner.

Robert E. Duncan, Office of Gen. Counsel, U. S. Dept. of Agriculture, Edwin L. Weisl, Jr., Asst. Atty. Gen., Morton Hollander, Chief, Appellate Section, Civil Div., Dept. of Justice, Neil Brooks, Asst. Gen. Counsel, Harold M. Carter, Atty., Dept. of Agriculture, Washington, D. C., for respondents.

Before MAJOR, Senior Circuit Judge, HASTINGS and CUMMINGS, Circuit Judges.

CUMMINGS, Circuit Judge.

At the instance of the Western States Meat Packers Association, the United States Department of Agriculture filed a complaint in 1962 against Armour and Company alleging violations of Section 202(a), (b) and (e)[1] of the Packers and Stockyards Act (7 U.S.C. § 192(a), (b) and (e)).

Armour is the second largest meat packer in the United States. In January and February of 1959, pursuant to recommendations contained in a survey conducted by N. W. Ayer & Co., Armour's Western Area advertising agency, the management of the Western Area of its Foods Division embarked upon a 5-week promotion of thick-sliced bacon by offering consumers a 50¢ coupon refund on the purchase of each 2-lb. package of such bacon in Alaska, Hawaii, Oregon, Washington and most of California. The Ayer survey disclosed that except for Spokane, Armour had less than 5 per cent of the

---

1. The charge under Section 202(e) was subsequently dismissed.

meat market in the Western Area, but in Spokane it had approximately 25 per cent of the market. The bacon promotion coupon plan was designed to increase the sale of all Armour Star meats, as well as to increase the sale of Armour Star thick-sliced bacon and establish a brand preference for such bacon in its new packaging and new rindless cut. This was a substantially new product, and Armour hoped that the purchasers would consume twice as much bacon by using the same number of slices of thick-sliced bacon as regular bacon. Ads were run featuring the bacon coupon promotion singly and in conjunction with other Armour Star products.

The Judicial Officer of the Department of Agriculture concluded that Armour's practice violated Section 202(a) and (b) of the Act, which makes it unlawful for a packer to:

"(a) Engage in or use any unfair, [or] unjustly discriminatory, * * * practice * * * in commerce; or

"(b) Make or give, in commerce, any undue or unreasonable preference or advantage to any particular person or locality in any respect whatsoever * * *." (7 U.S.C. § 192(a) and (b).)

The refund offer was limited to one 50¢ payment per family and required the consumer to mail a coupon from the thick-sliced bacon package to Armour's advertising agency in San Francisco. The 50¢ figure was chosen for the coupon refund after considering the number of redemptions expected and the range of refunds, from 10¢ to full purchase price, offered in other companies' food promotions. For example, Oscar Mayer & Co., a competitor of Armour in the San Francisco portion of the Western Area, had previously offered 50¢ refunds on various meat products.

The financing of this coupon plan was from funds solely in Armour's Western Area, including trade territories not covered by the coupon-refund offer. In 1959, Armour spent ¾ of a cent per pound for promotion for all processed meats produced in the Western Area. Each plant in the Western Area was to receive advertising and promotional value proportionate to the assessments against the projected production from that unit. Otherwise, the unit received a refund for monies not used in its territory, so that no unit of the Western Area contributed more than it received in advertising and promotion. About 286,000 persons accepted the five-week offer, costing Armour $143,000 instead of the $25,000 intended to cover this and two other scheduled promotions, one for this same product and one for frankfurters. As a consequence of the unexpected cost of the coupon-refund program, Armour's Western Area management canceled the two later coupon promotions and curtailed other advertising of individual Armour Star products that had been scheduled for other parts of 1959. Because of this cutback in its advertising program, $107,000 contributed by the various Western Area units was returned to them (Petitioner's Exhibit 22).

During the period in question, Armour's wholesale prices for 2-lb. packages of this bacon ranged from 85.6¢ to $1.20 in this area. According to the Department, disregarding the coupon plan, Armour's profit margin was 2 to 4 cents per package. While the refund was in effect, the net price to an accepting consumer was 50 to 60 per cent of the retail price. During the coupon period, Armour's average weekly sales of this product increased from 121,000 lbs. to an average of 360,000 lbs., but its sales of regular bacon decreased sharply. Its total sales during the redemption period consisted of approximately 900,000 2-lb. packages, and there was a 31.8 per cent response by consumers to the coupon plan, indicating that the cost of the refund plan was 16¢ per 2-lb. package.

The Judicial Officer concluded that Armour's coupon plan increased its sales of thick-sliced bacon while its competitors lost sales and accounts during the promotion period. He determined that the practice was unfair or, alternatively, unjustly discriminatory under Section 202(a) of the Act and that the practice also constituted an undue or unreasonable prefer-

ence or advantage under Section 202(b). Accordingly, the following cease and desist order was entered in 1967:

> "Immediately prior to the launching of any program offering or giving a refund to any retail purchaser or consumer of meats or meat food products, respondent shall ascertain the unit cost at that time for the item in connection with which the refund is offered, and shall cease and desist from offering or giving a refund which when added to said unit cost results in a net unit return for the item to respondent substantially less than unit cost (including the amount of the refund). *Provided*: That this order shall not apply to the introduction of a really new meat product." (26 Agr. Dec. 484, 515.)

In asking us to set aside the Judicial Officer's decision and order, Armour asserts that its bacon sales were not below cost and that no predatory intent was shown. Armour also claims that there is no substantial evidence that the business of competing packers was injured. Finally, the scope of the order is assailed, but as will appear, there is no need to consider that point.

*Below Cost Sales Are Not Clearly Demonstrable Here*

This is admittedly a test case to determine the validity of coupon promotion plans under the Packers and Stockyards Act. Armour sold the thick-sliced bacon in question to retail stores at its regular wholesale prices, and those stores in turn sold to consumers at regular retail prices. To support the Department's assertion that Armour's sales to the retail stores were below cost, we are told that the amount of the coupon refund must be added to Armour's unit costs of bacon during this five-week period. On the other hand, Armour argues quite persuasively that the coupon plan was meant to improve the sale of all Armour Star products throughout the year and therefore cannot be charged to the five-week production cost of thick-sliced bacon. In conformity with the practice of other packers, all Armour Western Area meat products were assessed for the cost of the program even though the coupon refunds concerned only 2-lb. packages of thick-sliced bacon. Considering that the coupon promotion plan was designed to stimulate bacon and other sales beyond its duration, it is questionable whether the $143,000 should be charged to thick-sliced bacon costs during the five weeks the plan was in existence, as the Department urges.[2]

Even accepting *arguendo* the Department's novel premise that the entire $143,000 cost of the coupon promotion should be charged to the cost of producing the thick-sliced bacon and reflected in the sales to the retail stores during the five weeks of the promotion, there is no warrant for adding, as the Department does in its brief, 50¢ to the cost of every package of bacon sold during the period in question in determining the extent of any Armour loss on the bacon. In fact, the Judicial Officer's opinion concedes that only 31.8 per cent of the purchasers of these packages (286,000 out of some 900,000) actually accepted the redemption offer (26 Agr. Dec. at p. 496). Thus the cost to Armour amounted to 16¢ per package when the total sales during the period of the promotion are taken into consideration. After the Department's tabulation of Armour's unit cost per package is adjusted to reflect this 16¢ (or $8 per cwt.) additional cost rather than 50¢ (or $25 per cwt.), it appears that Armour at

2. The Department's assertions that Armour charged the entire cost of the promotion to its bacon sales, apparently abandoned at p. 17 of its brief in this Court, do not appear to be supported in the record, nor do Armour's internal accounting periods coincide with the duration of the promotion. The Department's own witness for this purpose repeatedly asserted that the accounting treatment of the promotional program was a matter of internal business policy, and the sole competitor who suggested that he might have charged off the promotion expense differently admitted that his operations were altogether different than Armour's.

all times made a profit on the bacon during the promotional period, as shown in the following adjusted Departmental tabulation [3]:

Armour and Company's Production or Unit Cost Per Hundredweight and Profit on Armour Star 2-Pound, Thick-Sliced Bacon Based on the Market Value of Green or Fresh Bellies and Expenses in Its Sliced Bacon Departments for the First Full Week of the Promotion, *Viz.*, January 24, 1959

| Plant | Market Value of Green or Fresh Bellies Weighing 14–16 Lbs. Per Cwt. | Average Processing Expenses— Sliced Bacon Department | Partial Production or Unit Costs Per Cwt. (Including 16¢ Per 2 Lbs. or $8 Per Cwt. Refund) | Range of Invoice Prices Charged Retail Stores Per Cwt. | Range of Amount of Profit Per Cwt. |
|---|---|---|---|---|---|
| Spokane, Washington | $26.64 | $9.79 | $44.43 | $45.0 to $53.0 | $ .57 to $ 8.57 |
| Portland, Oregon | 26.69 | 9.47 | 44.16 | 45.0 to 53.0 | .84 to 8.84 |
| South St. Paul, Minnesota | 23.75 | 8.25 | 40.00 | 45.0 to 53.0 | 5.00 to 13.00 |
| Omaha, Nebraska | 23.75 | 8.46 | 40.21 | 45.0 to 53.0 | 4.79 to 12.79 |

As the foregoing tabulation shows, Armour's minimum profit on bacon where refunds were made ranged from 57¢ to $13 per cwt., or from 1¢ to 26¢ per 2-lb. package.

The Department also suggests that the coupon plan resulted in below cost sales either on a standard cost basis [4] or based on Armour's branch housing billing prices and sliced bacon department expenses. In so concluding, the Department has again employed a 50¢ refund figure for each 2-lb. package instead of the actual 16¢ refund cost per package. On either basis, when $8 per cwt. is added to account for the cost of the refund, the cost per 2-lb. package is several cents less than the highest prices Armour was charging retail stores during the promotion period and shows that Armour was not selling all this bacon below cost.[5]

■ Elsewhere the Department's brief asserts that Armour's profit margin on each 2-lb. package of this bacon was from 2 to 4 cents.[6] Assuming that these are the correct profit margins, the returns to Armour during the five-week program would be from 12 to 14 cents per 2 lbs.

3. The Department's brief states that this table does not include certain other Armour bacon expenses. The figures employed here may be direct or marginal costs as opposed to fully distributed or total costs. The tabulation does not appear in the record but is found at p. 57 of the Department's brief in this Court.

4. Armour explained before the hearing examiner that it determined standard costs as follows:
   "To determine the standard test cost for the first time * * * on a given item, an operation man is sent to the plant to view the actual operation, to determine that it is handled properly according to specifications. An industrial engineer will study the same operation in determining the amount of labor to expend in producing the given item. From an accounting standpoint we pro rate the overhead based on instructions as given by the home office, and through all of these operations we can come up with a standard yield, standard labor cost, standard overhead cost, to apply to the green value of the raw material used in producing the item."

5. The compilations appear at pp. 59 and 61 of the Department's brief in this Court.

6. The Judicial Officer determined that the profit margin was 1 to 5 cents per 2-lb. package (26 Agr. Dec. at p. 489).

below unit cost if the entire $143,000 cost is properly chargeable to that brief period and to thick-sliced bacon. But on this record, we need not decide whether this coupon refund plan is truly a sale below cost to retail stores, for the Judicial Officer's decision and order must be set aside since it is based on a misconstruction of the Act and on findings unsupported by substantial evidence.

*Intent to Destroy Competition or Eliminate a Competitor*

■ At the oral argument, the Department's counsel agreed that coupon promotion plans cannot be deemed *per se* "unfair practices" within the meaning of Section 202(a) of the Packers and Stockyards Act. On the other hand, Armour agrees that this 1921 Act "was intended to go beyond then existing anti-trust statutes, and that the standards of the Act are not static." This is an acknowledgment by both parties that the Secretary of Agriculture has broad powers under Section 202(a) with regard to trade practices which are "unfair" in that they conflict with the basic policies of the various antitrust statutes, even though the practices may not actually violate those statutes. Cf. Federal Trade Commission v. Brown Shoe Co., 384 U.S. 316, 321, 86 S. Ct. 1501, 16 L.Ed.2d 587. However, the Department has not shown to our satisfaction that this coupon program so conflicts. Our conclusion, derived from case law and legislative history, is that a coupon program of this nature does not violate Section 202(a), absent some predatory intent or some likelihood of competitive injury. The latter aspect of this case is discussed later in this opinion.

When viewed together, the antitrust laws, although not completely harmonious and frequently overlapping, express a basic public policy distinguishing between fair and vigorous competition on the one hand and predatory or controlled competition on the other. Normally the twin solvents for determining when the boundaries of fair competition have been exceeded are the existence of predatory intent and the likelihood of injury to competition. The clearer the danger of the latter, as when competitors conspire to eliminate the uncertainties of price competition, the less important is proof of the former. Conversely, the likelihood of injury arising from conduct adopted with predatory purpose is so great as to require little or no showing that such injury has already taken place. Each statutory prohibition of specified acts or practices reflects the Congressional conclusions as to the gravity of the injury to be feared and the relative difficulty of distinguishing honest competition and predation. The fact that a given provision does not expressly specify the degree of injury or the type of intent required, does not imply that these basic indicators of the line between free competition and predation are to be ignored. Surely words such as "unfair" and "unjustly" in Section 202(a) and "undue" and "unreasonable" in Section 202(b) require some examination of the seller's intent and the likely effects of its acts or practices under scrutiny, even though these tests under Section 202(a) and (b) be less stringent than under some of the anti-trust laws. These adjectival qualifications expressed in the statutory language enjoin the Department and courts to apply a rule of reason in determining the lawfulness of a particular practice under Section 202(a) and (b).

This portion of the Packers and Stockyards Act was first construed by this Court in an exhaustive opinion in Swift & Co. v. Wallace, 105 F.2d 848 (7th Cir. 1939). As the keystone to its construction, the Court noted at the threshold that Section 202(a) and (b) "does not purport to confer upon the Secretary of Agriculture any authority directly to regulate prices, or discounts, or sales methods; and clearly does not contemplate the exercise of any authority to establish uniformity of practice in respect thereto" (at p. 853). Specifically with respect to Section 202(a), Judge Treanor observed that it was "easily conceivable" that "a course of discrimination in terms of credit engaged in *for the purpose of injuring* a particular person or locality,

or necessarily resulting in injury" could offend against Section 202(a) (at p. 862; emphasis supplied). The *Swift* case approved discounts required by business realities or justified by accepted standards of industry fairness. For violation of Section 202(a), the opinion contemplated either intent or adverse competitive effect.

Wilson & Co. v. Benson, 286 F.2d 891, 895 (7th Cir. 1961), pointed out that the *literal language* of Section 202(a) does not specify that a competitive injury or a lessening of competition or a tendency to monopoly be proved, but that record amply supported the Judicial Officer's finding that Wilson's discriminatory price-cutting campaign was intended to stifle competition and resulted in a substantial diversion of business to Wilson. In fact, the sole purpose of Wilson's below-cost price cuts was to take accounts from its competitors and to discipline its former area manager for having taken customers away from Wilson. Seventy-five per cent of its San Francisco hotel meat supply business came from the below-cost price cuts. Here Armour was concerned with brand identification at the consumer level and not with coercing retailers to take its products. Armour continued to sell to retailers at regular prices. This was a short-term promotional campaign, whereas Wilson engaged in a protracted policy of selective price-cutting to retailers in order to take customers away from its competitors. In short, the *Wilson* case does not support the Department's view that neither intent nor some kind of competitive injury is necessary for the operation of Section 202(a).

Our construction of the *Wilson* case is reinforced by Swift & Co. v. United States, 308 F.2d 849 (7th Cir. 1962), which was this Court's next consideration of Section 202(a). · The agreement there between the packer and another hog buyer to split or share the purchase of top-grade hogs was held to violate Section 202(a) because the "essential nature and the necessary result of this * * * practice was to eliminate competition" (at p. 853). The agreement not to compete itself supplied the requisite intent. But *Swift's* dissemination of price information to country dealers was held not to violate Section 202(a) and a Regulation thereunder because the purpose was to consummate a sale rather than to eliminate competition. One practice violated the Act because of Swift's anti-competitive intent. The other practice was permitted because of the absence of any such intent.

Similarly, in a closely related field, in E. B. Muller & Co. v. Federal Trade Commission, 142 F.2d 511 (6th Cir. 1944), the court clearly considered Muller's intent to stifle its only rival's competition to be the critical criterion for determining whether Section 5 of the Federal Trade Commission Act[7] had been violated by Muller's price cuts.

It is significant too that consent decrees ordinarily prohibit sales below cost only when the intent or effect is to suppress competition. See, e.g., United States v. Western Newspaper Union, 1960 CCH Trade Cases ¶ 69,709 (S.D.N.Y.1960); United States v. Ekco Products Co., 1957 CCH Trade Cases ¶ 68,768 (N.D.Cal.1957); United States v. Safeway Stores, Inc., 20 F.R.D. 451 (N.D.Tex.1957); United States v. National Linen Service Corp., 1956 CCH Trade Cases ¶ 68,398 (N.D.Ga.1956); United States v. R. L. Polk and Co., 1955 CCH Trade Cases ¶ 67,993 (E.D.Mich.1955); United States v. New York Great Atlantic & Pacific Tea Co., Inc., 1954 CCH Trade Cases ¶ 67,658 (S.D.N.Y.1954). And one of the reasons Federal Trade Commissioner Elman gave for the dismissal of the unfair practice complaint in Quaker Oats Co., CCH Trade Reg. Rep., 1963–1965 Transfer Binder, ¶ 17,-134 (FTC 1964), was that, as here, the

---

7. Resembling in phraseology Section 202 (a) of the Packers and Stockyards Act, Section 5 of the Federal Trade Commission Act bars "Unfair methods of competition in commerce, and unfair or deceptive acts or practices in commerce * * *" (15 U.S.C. § 45).

record failed to support an inference that the manufacturer acted predatorily by selling oat flour below cost.

■■ Price cutting was not regarded as unlawful under the common law. Mackey v. Sears, Roebuck and Co., 237 F.2d 869, 874 (7th Cir. 1956), certiorari dismissed, 355 U.S. 865, 78 S.Ct. 114, 2 L.Ed.2d 70. A pricing policy is not proscribed just because it might result in the destruction of a competitor, for the antitrust laws are not intended to protect a business against loss in a competitive market. Ben Hur Coal Co. v. Wells, 242 F.2d 481, 486 (10th Cir. 1957), certiorari denied, 354 U.S. 910, 77 S.Ct. 1296, 1 L.Ed.2d 1427. The presence of predatory intent and injury to competition was emphasized throughout Utah Pie Co. v. Continental Baking Co., 386 U.S. 685, 87 S.Ct. 1326, 18 L.Ed.2d 406, as justifying the guilty verdict against the price cutter. The absence of such intent resulted in the denial of a decree in Hershel California Fruit Products Co. v. Hunt Foods, Inc., 111 F.Supp. 732, 734 (N.D.Cal.1953). There Hunt reduced the price of its tomato paste by $1 per case over a period of one and one-half years.[8] Nevertheless, a preliminary injunction was refused because no malevolent intent was apparent. The court concluded that this reduction was intended to secure customer acceptance of the tomato paste and was suggested by an outside adviser. Similarly here, one of the reasons for Armour's coupon plan was to secure customer acceptance of the newly packaged, rindless, thick-sliced bacon and other Armour Star products and was at the suggestion of an outside advertising agency in the Western Area.

The Department relies heavily on Federal Trade Commission v. Anheuser-Busch, Inc., 363 U.S. 536, 80 S.Ct. 1267, 4 L.Ed.2d 1385, but the only question there was whether there could be a "price discrimination" within Section 2(a) of the Robinson-Patman Act without a purpose or design to eliminate competition. The Court refused to read Section 3 of the Robinson-Patman Act into Section 2 (a) but did agree that predatory intent would be relevant as to the likelihood of injury to competition (at p. 552, 80 S.Ct. 1267). Although we realize that Robinson-Patman analogies are not conclusive under the Packers and Stockyards Act, it is noteworthy that the *Anheuser-Busch* case does not hold that price discriminations *per se* violate Section 2(a). There can be no violation unless the effect of the discrimination "may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition * * * *" (15 U.S.C. § 13).[9]

■ Of course, illicit intent may be inferred from a seller's sustained undercutting of rivals' prices or from persistent unprofitable sales below cost. Utah Pie Co. v. Continental Baking Co., 386 U.S. 685, 702–703, note 14, 87 S.Ct. 1326, 18 L.Ed.2d 406; Rowe, Price Discrimination Under the Robinson-Patman Act, p. 146 (1962). If Armour's losses had been so extravagant as to be unrecoverable, it could be persuasively argued that the object of this program was to inflict injuries on rivals regardless of the expectation of ultimate profit. See Union Leader Corp. v. Newspapers of New England, Inc., 180 F.Supp. 125, 143 (D.Mass. 1960), modified, 284 F.2d 582 (1st Cir. 1960), certiorari denied, 365 U.S. 833, 81 S.Ct. 747, 5 L.Ed.2d 744. Instead, the following language from Anheuser-Busch, Inc. v. Federal Trade Commission, 289 F.2d 835, 842 (7th Cir. 1961), on remand, is singularly applicable to Armour's conduct:

> "Its conduct was in conformity with the principle that competition is the decisive force in the market place.

---

8. See Hershel California Fruit Products Co. v. Hunt Foods, Inc., 119 F.Supp. 603, 605 (N.D.Cal.1954).

9. The appropriateness of drawing on the Robinson-Patman analogy was realized, however, in Wilson & Co. v. Benson, 286 F.2d 891, 895 (7th Cir. 1961), where it was held that the language of Section 202(a) includes practices which violate the Robinson-Patman Act.

That conduct is the antithesis of the predatory misconduct condemned in the above territorial pricing cases relied on by the Commission. In each of those cases the motive for the price cut was vindictive and the effect was punitive. There was not even a pretense that the price change was incident to a general intensification of the sales effort, as in the case at bar. It was a single lethal weapon aimed at a victim for a predatory purpose."

Also pertinent to Armour's conduct is the following excerpt from Balian Ice Cream Co. v. Arden Farms Co., 104 F. Supp. 796, 807 (S.D.Cal.1952), affirmed, 231 F.2d 356 (9th Cir. 1955), certiorari denied, 350 U.S. 991, 76 S.Ct. 545, 100 L.Ed. 856:

"[T]he object of the anti-trust law is to encourage competition. Lawful price differentiation is a legitimate means for achieving the result. It becomes illegal only when it is tainted by the purpose of unreasonably restraining trade or commerce or attempting to destroy competition or a competitor, thus substantially lessening competition, or when it is so unreasonable as to be condemned as a means of competition. The price reduction here has none of these stigmata."

See also F. & A. Ice Cream Co. v. Arden Farms Co., 98 F.Supp. 180, 189–190 (S.D.Cal.1951).

It is often difficult to distinguish between predatory and healthy pricing practices. However, we are satisfied that this coupon program was designed to obtain a larger share of Armour Star business in the marketing area and was not a destructive attack on local competitors. The competitive justification for the program was to introduce thick-sliced 2-lb. bacon, considered by Ayer and Armour potentially to be a high profit item, into more homes. It was intended to result in a per capita increase in bacon consumption, but not necessarily at the expense of Armour's competitors. Armour's own sales of regular bacon declined drastically during its campaign.

Armour's spirited competition, beneficial to consumers and not hurtful to its competitors, should not be indicted in the name of antitrust. See Rowe, op. cit., pp. 150, 465–466. Coupon practices are widespread in the food industries and have been employed by Armour's competitors. This was a five-week Western Area program and was inspired by an outside advertising agency. Already projected coupon plans were promptly canceled in view of the unexpected cost of this one. The plan was financed solely from the Western Area of Armour's Foods Division and evidently involved no greater expenditures than in other years. Many of the advertisements clearly linked the bacon sales with other Armour Star products for promotional reasons. N. W. Ayer & Co. and Armour's Western Area management certainly did not intend the thick-sliced bacon promotion to take most of the promotion budget, for promotions of many other Armour Star items were also planned for 1959. Only $25,000 had been budgeted by Armour for all three coupon plans. Armour's anticipation of only a small response to its coupon plan is still another indication of the absence of intent to eliminate competition.

The legislative history of the Packers and Stockyards Act fully supports our conclusion that Section 202(a) was not directed at this type of promotion unless there was some intent to eliminate competition or unless the effect of the promotion might lessen competition. Thus the Senate Committee Report makes it clear that this part of the legislation was promoted primarily by fear of monopoly and predation, but even so, caution was expressed against stifling the initiative of the industry. Senate Report No. 429, 66th Cong., 2d Sess. (1920), pp. 1, 3. In turn, the House Committee said that the legislation was aimed at halting "a general course of action *for the purpose of destroying competition*" (emphasis supplied). See House Report No. 1297, 66th Cong., 3d Sess. (1921), p. 11. As explained by Chief Justice Taft in Stafford v.

Wallace, 258 U.S. 495, 514–515, 42 S.Ct. 397, 401, 66 L.Ed. 735, the chief evil feared was "the monopoly of the packers, enabling them unduly and arbitrarily to lower prices to the shipper, who sells, and unduly and arbitrarily to increase the price to the consumer, who buys." The present case involves neither this evil nor any of the other malpractices discussed in the *Stafford* case.

In the House hearings on Meat Packer Legislation, the Secretary of Agriculture testified that it was not the Department's idea to have Congress authorize the Department to "legislate prices in any way." Hearings on Meat Packer Legislation before the House Committee on Agriculture, 67th Cong., 1st Sess., Series D (1921), p. 237. He complained of packers who "*drove out* the local butchers years ago by selling at less than a fair price" (at p. 240; emphasis supplied), thus illustrating the gloss to be placed on "unfair practice" in Section 202(a).

Even the legislative history relied upon by the Department in its brief shows that Section 202(a) was aimed at sales below cost where the packer intended to eliminate competitors or injure competition through geographic price discrimination. See Hearings on Meat Packer Legislation before the House Committee on Agriculture, 66th Cong., 2d Sess. (1920), pp. 2211, 2657.[10] The main Congressional motivation was not the deficient reach of the Sherman, Clayton, Interstate Commerce Commission and Federal Trade Commission Acts, but the felt need for specialized regulation of the many-tiered packing industry, with its unique problems arising from marketing and distributing livestock and poultry, including all the complications arising from packer ownership of stockyards. That is why the Department of Agriculture, with its expected expertise, was chosen as the overseer of this industry. However, the legislative history does not show that the Secretary was to have *carte blanche* in prohibiting whatever practices he pleased. Otherwise the courts would not be empowered to set aside his orders (7 U.S.C. § 194(e)).

The Judicial Officer concluded that if predatory intent was needed, Armour's "intent" to divert business from its competitors was sufficient. He resorted to question-begging reasoning, stating "While diverting customers to oneself is normal and usual competition, respondent did so through the use of an illicit method" (26 Agr.Dec. at p. 513). But, as we have seen, there was nothing illicit in Armour's method unless there was some predatory intent or the likelihood of injuring competition.

Throughout its brief, the Department stresses Armour's supposed desire to "block out" more efficient competitors. Actually, this phrase was derived from N. W. Ayer & Company's August 1957 promotional recommendations to Armour. The full quotation refers to the Spokane market and is as follows:

"Since the common practices of processed meat retailing make it very difficult for any one brand to get and hold a favorable place and space in a meat department, it is important that Armour remain aggressive with the trade and block out the possibility of a more aggressive competitor. Ar-

---

10. Thus the Secretary of the American National Livestock Association testified: "[I]n earlier periods the packers did use every available method to drive the small independents out of business. They would, so I am credibly informed, undersell them in localities until they entailed upon these independents so severe losses that they either had to go out or be absorbed. Of course, a big institution like one of the five packers could well afford to do this and absorb the losses that might be caused by this underselling in other branches and make it up later on after they had eliminated that competition." Meat-Packer Legislation, Hearings Before the Committee on Agriculture, House of Representatives, 66th Cong., 2d Sess. (1920), p. 2211. See also, ibid., at 2657; see also Report of the Federal Trade Commission on the Meat-Packing Industry, Part IV (1919), pp. 235–236.

mour should give evidence of an interest in the merchandising and marketing problems of the retailer."

This Ayer recommendation certainly does not support any finding that Armour's coupon program was prompted by predatory intent. The recommendation was merely to compete vigorously.

Here there was no acceptable evidence that Armour intended the compaign to reduce local competition or to coerce retailers. Instead, its purpose was to bring Armour Star products, including thick-sliced bacon, to the attention of more customers in markets where Armour held an insignificant share. The widespread and previously uncurtailed use of such campaigns by others also indicates that this particular one neither evidenced bad faith nor the likelihood that harm would result. Since Armour did not abuse this tactic knowingly, it should not be restricted from employing this method of encouraging competition in the meat industry. This is not to say that the Secretary would not be justified in condemning long-term or frequent and costly campaigns of this nature if motivated by an attempt to destroy competition or if likely to injure competition. As with Section 3 of the Robinson-Patman Act, Congress certainly empowered the Secretary to condemn sales made below cost for the purpose of destroying competition or eliminating a competitor or having adverse competitive effects. Cf. United States v. National Dairy Products Corp., 372 U.S. 29, 34, 35, 83 S.Ct. 594, 9 L.Ed.2d 561.

While Section 202(a) of the Packers and Stockyards Act may be broader than antecedent antitrust legislation found in the Sherman, Clayton, Federal Trade Commission and Interstate Commerce Commission Acts, there is no showing that there was any intent to give the Secretary of Agriculture complete and unbridled discretion to regulate the operations of packers. Section 202(a) should be read liberally enough to take care of the types of anti-competitive practices properly deemed "unfair" by the Federal Trade Commission (15 U.S.C. § 45) and also to reach any of the special mischiefs and injuries inherent in livestock and poultry traffic. However, in Section 202(a) Congress gave the Secretary no mandate to ignore the general outline of long-time antitrust policy by condemning practices which are neither deceptive nor injurious to competition nor intended to be so by the party charged.

*Likelihood of Competitive Injury*

Even if predatory intent is absent, Armour's coupon program might violate Section 202(a) if it would probably result in competitive injury, tend to restrain trade or create a monopoly. The Judicial Officer's decision stated that coupon refunds *per se* were not invalid, and that he was concerned only with the "competitive impact or probable impact" of the plan (26 Agr.Dec. at p. 509). He thus considered that the plan would not be illegal apart from the deleterious impact on competitors.[11] His position was consistent with the prior opinions of this Court under Section 202(a).

In Swift & Co. v. Wallace, 105 F.2d 848, 862 (7th Cir. 1939), the Court observed that discriminatory action "necessarily resulting in injury" to competitors would appear to violate Section 202 (a) of the Act.

In Wilson & Company v. Benson, 286 F.2d 891, 895 (7th Cir. 1961), it was noted that the exact wording of Section 202(a) does not specify that competitive injury must be proved. However, the order was sustained because "Wilson was successful in diverting a substantial volume of business from its competitors" through its price-cutting policy (at p. 893). The Department is incorrect in stating that the *Wilson* case abandoned any competitive injury requirement in the absence of predatory intent.

---

11. Likewise, the Department's witness, Dr. Vernon Mund of the University of Washington, only condemned price cuts that injured competition or were likely to do so (26 Agr. Dec. at p. 505).

In Swift & Co. v. United States, 308 F.2d 849 (7th Cir. 1962), the Court did not have to reach the petitioner's contention that Section 202(a) would not be violated unless there was a tendency unduly to hinder competition. Rather, it concluded that the agreement in question necessarily resulted in the elimination of competition, so that Section 202 (a) was violated.

Finally, in Swift & Co. v. United States, 317 F.2d 53, 55 (7th Cir. 1963), the Judicial Officer's cease and desist order under Section 202(a) and (b) of the Act was upheld because there was substantial evidence of injurying competition.[12]

■ Evidently acting under these precepts, the Judicial Officer found that Armour's coupon plan "seriously disrupted" other packers' bacon business (26 Agr.Dec. at pp. 496–497). However, this finding is not supported by substantial evidence and cannot be sustained.

Our study of the evidence bearing on possible injury to competition does not disclose causal connection between fluctuations in bacon sales and Armour's five-week promotion. The various exhibits reveal extreme fluctuations in number of pounds sold by Armour's competitors to various Western Area retail stores during the 1958–1960 period. Armour's promotion did not mark a change in the future pattern of sales for any competitor, for some with rising bacon sales continued to rise during and after the promotion, and some with falling sales continued to fall. Sales by some Armour competitors to certain chain stores declined, but sales of other Armour competitors to the same or other chain stores showed increases. Morrell, Hormel, Hy-Grade and Seattle Packing Company all had substantial increases in bacon sales during the promotional period. Of course, the Department would not have to demonstrate that all of Armour's competitors lost business during the promotion period in order to find injury to competition; severe losses to some competitors would, if causally related to the promotion, be some evidence of a tendency to injure competition. But in light of the completely unpredictable fluctuations which characterized the bacon market in the Western Area during the years prior to, during and after the promotion, and in the absence of some evidence that fluctuations during the promotion were unusual, the fact that almost as many competitors showed sharp rises in sales as others did losses, explains the Department's total failure to demonstrate even a tendency to injure competition.

Moreover, there is no suggestion that the promotion had any lasting effect whatsoever on any competitor as the trend of market shares of 1958 through 1960 demonstrates. In Portland in 1960, Armour experienced a severe drop from 43 per cent to 19 per cent of the No. 1 thick-sliced bacon market while some of its competitors gained. Its share of that market on a weekly basis in 1959 ranged from 3 to 92 per cent, but this did not indicate any success of its promotion, for its fluctuations in 1958 were from 4 to 87 per cent and in 1960, from 4 to 53 per cent. Moreover, the thick-sliced bacon shares of its competitors also fluctuated widely in each of the three years, with some competitors fluctuating from 0 to 87 per cent in 1959, or from 1 to 56 per cent in years other than 1959. The absence of causality is further demonstrated by the fact that while all of Armour's Portland competitors showed some weeks where their shares of the market were negligible, in many cases their worst weeks came much later in the year than the coupon promotion. There were similar wide fluctuations in total bacon sales.[13] In the same years, Ar-

---

12. The Department is not required to prove injury to competition in the event that injury is likely. Swift & Co. v. United States, 393 F.2d 247, 253, 255 (7th Cir. 1968).

13. Being interchangeable, all bacon and thick-sliced bacon market shares may properly be considered together. Cf. United States v. E. I. du Pont De Nemours & Co., 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264.

mour's share of the total Portland bacon market (over four times the thick-sliced market) slipped from 27 per cent to 24 per cent, and then to 9 per cent, while its share of the regular bacon market varied from 12 per cent to 14 per cent and finally to 7 per cent.

We do not and need not deny that some competitors' sales to some retail outlets declined during the promotion, but it is central to our conclusion that there is no substantial evidence of injury when the statistics may be selected so as to provide some support for almost any conclusion. It is not surprising, then, that the findings of the Judicial Officer include figures tending to show that Armour's promotion may have displaced some competing thick-sliced bacon brands temporarily at selected outlets. It is interesting to note, however, that even the figures relied on by the Department in the Judicial Officer's decision demonstrate that a substantial portion of the diversion was from other Armour bacon products. Thus although Armour's sales of thick-sliced bacon to Fred Meyer, Inc. in Portland increased by 18,120 lbs. during the promotion, and competing sales of all bacon products decreased by 7,022 lbs., Armour's own sales of regular bacon to the same stores dropped by 8,804 lbs. during the period. Other figures from the Department's own exhibits also refute its case.[14] For example, in Seattle, Armour's (and a subsidiary's) thick-sliced 2-lb. package sales to Safeway Stores rose by 27,984 lbs. during the promotion, but its own sales of all other bacon dropped by more than 65,000 lbs. in that period.

According to another Government exhibit,[15] Armour's sales of thick-sliced bacon to Seattle Safeway Stores rose from 8400 lbs. during the month before the promotion to 36,384 lbs. during the promotional period but at the same time, the sales of its other bacon decreased by 57,249 lbs., resulting in a 20.7 per cent diminution of Armour's share of that bacon market.

These figures serve to show that the over-all bacon market was vigorously competitive and highly volatile. Even though the promotional plan may have increased the per capita consumption of Armour's thick-sliced bacon, its sales of other bacon were so diminished that its all-bacon market share suffered. Armour's market share of bacon sales in Portland and Seattle declined in 1959 and also declined in 1960, whereas the market shares of eight of its competitors increased during the promotion year.

Armour's reply brief discloses that the Department failed to mention that John Morrell and Company bacon sales to Fred Meyer, Inc. in Portland during the promotional period increased by 600 per cent, and its sales to Safeway Stores in Seattle increased more than 500 per cent. Likewise, Swift's sales to Tradewell in Seattle were 60 per cent greater during the promotional period; Hormel's sales to Safeway in Seattle were 27 per cent greater; and Seattle Packing Company's sales to Safeway in Seattle were 175 per cent greater.

The Department stresses that Del Monte Meat Company lost its thick-sliced bacon sales to Safeway Stores in Portland during the promotional period. However, in that quarter, its total bacon sales to Safeway in Portland were two to three times greater than during the previous quarters. It nearly doubled its Safeway market share in Portland in 1959 and nearly tripled it in 1960. In

---

14. The Department's repeated contention that because Armour failed to object to the admissibility of the Department's statistical evidence it has waived its right to challenge its probative value is without merit. In light of the admittedly broad powers of an executive or administrative agency to receive evidence, it is not required that parties engage in the futile act of objecting to the admission of evidence in order to preserve the right on review to urge that the agency's order is not based on substantial evidence in the record as a whole. Cf. Capitol Packing Company v. United States, 350 F.2d 67, 76 (10th Cir. 1965).

15. This exhibit appears to exclude figures of an Armour subsidiary.

turn, Hormel thick-sliced bacon sales to Safeway in Portland increased by 430 per cent while Morrell's share of the thick-sliced bacon market in Portland rose from 15 per cent in 1958 to 41 per cent in 1960.

The Department asserts that a witness from Portland Provision Company said its bacon business "dropped way down," but the witness testified that he had no supporting records, and the uncontroverted evidence is that its total bacon sales increased from 171,340 lbs. in 1958 to 257,217 lbs. in 1959.

Although the Department's brief also urges that Armour's coupon promotion caused a decline in the Western Area bacon prices, the record shows that there was a general decline in bacon prices throughout the United States at the time of the promotion, so that Armour's coupon plan cannot have been the cause.

A distillation of the figures contained in this record shows that there was no significant market disruption even in the short run. We have found no probative evidence to show that the over-all sales of any single competitor of Armour declined during the time of the promotion. Increased sales of Armour thick-sliced bacon do not demonstrate an equal decline in competitors' sales, for, as seen, Armour's sales of other bacon correspondingly declined. We cannot say that any reasonable test of competitive injury was satisfied here where market shares were not altered significantly, no competitors were driven out, many increased their sales, and none even showed temporary financial losses. As in Capitol Packing Company v. United States, 350 F.2d 67, 76 (10th Cir. 1965), the statistics in this record are not "sufficient evidence" of injury to competition, for they simply do not show that Armour's competitors' bacon business was injured by this promotion.

## Territorial Discrimination

As seen, we hold that Armour's coupon plan was not an unfair practice within the meaning of Section 202(a) of the Act. In the alternative, the Judicial Officer concluded that since the refund was offered only in the Western Area of the United States, it was "unjustly discriminatory" within Section 202(a) and an "undue or unreasonable preference or advantage" within Section 202(b).[16] We disagree. The competitive justifications for the plan and lack of ill intent, described earlier in this opinion, negate its being unjust, undue or unreasonable.

Armour attacks the Judicial Officer's conclusion on the ground that there was no price discrimination within the meaning of Section 202(a) and on the ground that Section 202(b) applies only to interference with competition between purchasers from Armour. Because of the broad phrasing of both these provisions, the Act should not be read so narrowly. The practice in question was certainly a territorial discrimination and therefore could be considered "unjustly discriminatory" or as an "undue or unreasonable preference or advantage" if there were any predatory intent or likelihood of injury to competition. Because of the statutory requirement that the discrimination must be unjust or the preference undue or unreasonable, Congress did not intend to condemn this type of practice per se.

As with price discriminations in different territories under the Robinson-Patman Act, this Armour practice should not be proscribed absent any predatory intent or likely effect of competitive injury. See Rowe, Price Discrimination Under the Robinson-Patman Act, pp. 144–163 (1962). Here Armour did not finance sales below cost in the Western Area from profits from other areas to secure long-run benefits in the Western

16. He reasoned that these Sections were violated because the practice was at the expense of Armour's competitors and because of the considerations he had advanced to support the unfair practice charge, namely, injury to competitors.

But besides this primary line emphasis, he mentioned that only consumers in the Western Area received the benefits of Armour's program. (26 Agr. Dec. at p. 514.) There is no claim of secondary line injury, i. e., at the retail store level.

Area. This promotion was financed from local advertising money, and there is no showing that Armour spent any more for its 1959 advertising than in previous or subsequent years.[17] If there was any loss to Armour in this five-week sale of thick-sliced bacon, Armour hoped to recoup it by increasing total bacon consumption and attracting new customers for that and other products. Whatever discrimination or preference existed during this short interval was not unjust, undue or unreasonable.

Although the language of Section 202 (b) is patterned closely after Section 3 of the 1887 Interstate Commerce Act (49 U.S.C. § 3), the precedential value of the case law construing the earlier Section is somewhat limited by the important differences in the regulatory schemes imposed on the railroads on the one hand and the packers on the other. In particular, the pervasive rate-making authority of the Interstate Commerce Commission, which Congress did not see fit to grant the Department of Agriculture in the case of the packers,[18] together with the statutory prohibition of rebates (49 U.S. C. § 2), places the borrowed language in a different context. Moreover, the proviso to Section 3 by its own terms seems to exclude what might be called primary line injury, that is, injury to competing carriers, thus rendering the language as construed in the Commerce Act cases inapplicable to the principal "injured" parties here, namely, Armour's competitors, the only parties for which the record even attempts to demonstrate actual injury.

Nevertheless, as recognized in Swift & Co. v. Wallace, 105 F.2d 848, 853–856 (7th Cir. 1939), support for the construction which we have adopted here can be found in the cases construing Section 3. The Supreme Court has consistently declined to interpret Section 3 as prohibiting preferences and discriminations *per se*. See, e. g., Manufacturer's Ry. Co. v. United States, 246 U.S. 457, 481, 38 S. Ct. 383, 62 L.Ed. 831. Moreover, in defining what makes a preference or advantage "undue" or "unreasonable," the Court has recognized the relevancy of all competitive factors which a carrier would look to in determining that rate which would maximize its revenues. In Texas & Pacific Ry. Co. v. Interstate Commerce Commission, 162 U.S. 197, 218, 16 S.Ct. 666, 675, 40 L.Ed. 940, the Court said: "It is self-evident that many cases may and do arise where, although the object of the carriers is to secure the traffic for their own purposes and upon their own lines, yet, nevertheless, the very fact that they seek, by the changes they make, to secure it, operates in the interest of the public." The Court went on to discuss at length the cases under the English Railway and Canal Act of July 10, 1854, upon which Section 3 was modeled, and clearly approved in principle those cases which found that a mere difference in rate between one locality and another was not, absent some special showing of injury, an undue or unreasonable preference. The Court's caution that "strict uniformity is not to be enforced" seems to require something more than a showing that Armour chose to promote a new product in an area less than the entire country, before an undue or unreasonable preference between localities can be found.

The role of intent under Section 3 has also been acknowledged. In United

---

17. In concluding that the territorial discriminations were "unjust" under Section 202(a), the Judicial Officer said that coupon refunds were available only in part of Armour's Western Area whereas the financing of the coupon program came from the entire Western Area (26 Agr. Dec. at p. 514). He neglected to add that Armour annually refunded to Western Area sources those promotion costs not spent in their parts of the Western Area. Therefore, this criticism of the program is unwarranted.

18. However, the Packers and Stockyards Act does grant control over rates charged by stockyards and market agencies, and it may be significant that it is in this context that the Supreme Court has drawn on the analogy to Section 3 of the Interstate Commerce Act. See Denver Union Stockyard Co. v. United States, 304 U.S. 470, 481–482, 58 S.Ct. 990, 82 L.Ed. 1469.

States v. Illinois Central R.R. Co., 263 U.S. 510, 523–524, 44 S.Ct. 189, 192, 68 L.Ed. 417, Mr. Justice Brandeis stated:

"The effort of a carrier to obtain more business, and to retain that which it has secured, proceeds from the motive of self-interest which is recognized as legitimate; and the fact that preferential rates were given only for this purpose relieves the carrier from any charge of favoritism or malice. But preferences may inflict undue prejudice, though the carrier's motives in granting them are honest."

The "infliction" of prejudice suggests that the Court had in mind some demonstrable injury resulting from even a well-motivated preference. Indeed, the case upon which Justice Brandeis relied for this proposition, Interstate Commerce Commission v. Chicago & Great Western Ry. Co., 209 U.S. 108, 122, 28 S. Ct. 493, 498, 52 L.Ed. 705, quite clearly decided that intent to injure and actual injury were alternative indicia of the undue or unreasonable nature of the discriminations involved: "In short, there was no intent on the part of the railway companies to do a wrongful act, and the act itself did not work any substantial injury to the rights of the complainant."

Both parties have had extensive time to make their record. The complaint issued in 1962 and the hearings took place in 1964 and 1965. The Hearing Examiner's recommendation was filed in 1966, and the Judicial Officer's decision issued in 1967. After ample opportunity the Department has failed in its proof,[19] and that is an insufficient reason for reopening an already overstale case. Wilmington Provision Co. v. Wallace, 72 F.2d 989, 991 (3d Cir. 1934).

The Court is not substituting its judgment for that of the Judicial Officer as to inferences to be drawn from the evidence. Capitol Packing Company v. United States, 350 F.2d 67, 72 (10th Cir. 1965). Rather our conclusion is that Section 202(a) and (b) was erroneously construed and that the findings are not supported by substantial evidence. Accordingly, the order of the Judicial Officer must be set aside. So ordered.

19. For this reason it is unnecessary to consider other contentions advanced by Armour.