**CENTRAL COAST MEATS, INC., a California Corporation, et al., Petitioners,**

v.

**UNITED STATES DEPARTMENT OF AGRICULTURE, Respondent.**

No. 74–1302.

United States Court of Appeals, Ninth Circuit.

Aug. 10, 1976.

Todd C. Gaskill (argued), of Richardson & Gaskill, Fresno, Cal., for petitioners.

Kenneth H. Vail (argued), of U. S. Dept. of Agriculture, Office of Gen. Counsel, Washington, D. C., for respondent.

David H. Rosenberg (argued), of Rosenberg, Kasmir & Willingham, Dallas, Tex., for intervenor.

Before MERRILL, CHOY and GOODWIN, Circuit Judges.

MERRILL, Circuit Judge:

The Secretary of Agriculture, having determined that joint ownership by petitioners, Harold Habib, Sr., and Harry S. Habib of a cattle-buying business and a meat-packing business constitutes an unfair practice under §§ 202(a) and 312(a) of the Packers and Stockyards Act,[1] has ordered petitioners to divest themselves of one or the other of the two enterprises. Petitioners have taken this appeal from that order.

The Habibs are the owners and managers of Central Coast Meats, Inc. (CCM), a California corporation, whose business operations bring it within the definition of a packer. 7 U.S.C. § 191. They also do business as livestock buyers and sellers under the name of Habib Cattle Company (HCC), and their operations there bring them within the definition of dealer. 7 U.S.C. § 201(d).

A Department of Agriculture regulation, 9 C.F.R. § 201.68, bars ownership of a packer by a dealer, or vice versa. Section 201.70 of the Regulations condemns restriction or limitation of competition between packers and dealers.

The Department of Agriculture filed a complaint charging the Habibs with engaging in an unfair practice through their joint ownership of the two enterprises in question. A hearing was held and the administrative law judge concluded that joint ownership of the enterprises by the Habibs violated the regulations and thus constituted an unfair practice under the Act. On appeal the judicial officer, uncertain about the legal effect of the regulations, followed the Department's long-established policy of treating them as advisory only and disclaimed reliance upon them. Instead, he explored the record for proof of unfairness under the Act (see note 1).

Based on facts relating to the conduct of the Habibs' operations and on expert testimony the judicial officer found that the necessary effect of the unified operations of CCM and HCC was to reduce the number of bidders at sales; and that this reduction in the number of bidders would adversely affect the prices paid to producers. The judicial officer further found that unified operations would enable packers to: (1) monopolize public markets by tying purchasers of slaughter and feeder cattle; and (2) eventually control a large portion of the feeder market. The officer therefore concluded that "it is an 'unfair' practice, in violation of §§ 202 and 312(a) of the Act (7 U.S.C. 192 and 213(a)), for a packer to engage in business as a dealer, or vice versa." The divestiture order followed.

We do not believe that the judicial officer's broad conclusion is warranted under the Act. The true vice of a packer acting as a dealer as visualized by Congress is disclosed by § 202(c) and (d) of the Act, 7 U.S.C. § 192(c) and (d). These subsections provide:

"It shall be unlawful with respect to livestock * * * for any packer * * * to:

* * * * * *

(c) Sell or otherwise transfer to or for any other packer * * * or buy or otherwise receive from or for any other packer * * * any article for the purpose or with the effect of apportioning the supply in commerce between any such packers, if such apportionment has the tendency or effect of restraining commerce or of creating a monopoly in commerce; or

(d) Sell or otherwise transfer to or for any other person, or buy or otherwise receive from or for any other person, any article for the purpose or with the effect of manipulating or controlling prices in

---

1. § 202(a), 7 U.S.C. § 192(a), provides:
"It shall be unlawful with respect to livestock * * * for any packer * * * to:
(a) Engage in or use any unfair, unjustly discriminatory, or deceptive practice or device in commerce * * *."
§ 312(a), 7 U.S.C. § 213(a), declares:

"It shall be unlawful for any * * * dealer to engage in or use any unfair, unjustly discriminatory, or deceptive practice or device in connection with * * * buying, or selling * * * in commerce, of livestock."

commerce, or of creating a monopoly in the acquisition of, buying, selling, or dealing in, any article in commerce, or of restraining commerce; * * *."

■ By this language Congress has clearly announced that it is not a per se violation of § 202(a) for a packer to act as a dealer; the clear implication of § 202(c) and (d) is that such conduct is to be allowed in certain circumstances. Congress having spoken to this effect, it does not lie with the Department, through regulation or by order to formulate under § 202(a) a per se rule making such action unlawful in all cases.

■ The Habibs contend that, by virtue of § 202(c) and (d), a packer may act as a dealer unless such conduct is shown to have the actual effect proscribed in those subsections. The Secretary in reply argues that, in light of the broad nature of the Act and congressional mandate to the Secretary to prevent abuse, actual injury need not be shown and that § 202(a) may be used to uproot unfair practices in their incipiency. Such a construction would seem to render (c) and (d) meaningless surplusage. However, we shall assume, without deciding, that the Secretary's standard applies here. But even under this standard the Secretary must show that the conduct in question is likely to produce the sort of injury the Act is designed to prevent. *See Armour and Company v. United States,* 402 F.2d 712, 717, 722–25 (7th Cir. 1968), and this the Secretary has not done.

The record shows that CCM buys livestock on its own account to supply its packing house; HCC also buys and sells livestock on its own account for breeding and feeding purposes. Each entity is generally interested in different types of cattle; the packer is interested in slaughter cattle and the dealer in feeder and dairy cattle. The usual practice at the cattle sales attended by the Habibs was to deal first with the dairy and feeder cattle and later to deal with the slaughter cattle; occasionally, though, some dairy or feeder cattle would tardily make their appearance at the slaughter cattle sale. The presence of the Habibs at this later sale provided a buyer for this "straggler" market where none might otherwise have been present.

Despite the fact that HCC and CCM were generally interested in different sorts of cattle, there exist some cattle ("two-way") that are of a medial character that could interest both packers and dealers. It is with respect to these cattle that the judicial officer concluded that the Habibs had violated the Act, in that their separate operations had failed to compete for the purchase of such cattle. In support of his conclusion the judicial officer relied on undisputed facts adduced at the hearing. Ten times during one three-month period HCC bought cattle and later sold them to CCM at cost. On frequent occasions CCM and HCC employed the services of the same individual to bid for both entities at livestock sales, and in a few instances cattle bought by HCC were paid for by drafts drawn on CCM.

■ It must be acknowledged that CCM and HCC did not at all times conduct their operations as completely independent and competitive entities; in our view, however, this in itself is not sufficient to constitute a violation of the Act under the circumstances presented here.

The evil inherent in a failure to compete is that it actually eliminates a buyer from the marketplace who would otherwise be there. *See Swift & Company v. United States,* 393 F.2d 247 (7th Cir. 1968). It may be that the presence of the Habibs in their dual capacity at sales might discourage the presence of those who would otherwise be inclined to bid on the two-way cattle. There is no evidence that this actually occurred, or even that it was a likely result of the Habibs' dual operations.[2]

---

2. While there was expert testimony to the effect that others would naturally come in to take the Habibs' place once the Habibs ceased one of their operations, this testimony was not in any way founded on the facts of this case. Such generalized conclusions cannot take the place of specific evidence relating to the probability of other bidders' entry into the particular markets involved here.

The experts' testimony as to the other evils inherent in packers acting as dealers—e. g., tying, monopolization of markets—is insuffi-

**1328**

This hypothetical possibility with reference to a limited market in our view is not sufficient to warrant a conclusion that the Habibs' arrangement constitutes a violation of the Act. Against this possibility must be arrayed the actual fact that CCM and HCC each independently constituted a competitive force in the sales attended by the Habibs—one in competition with other packers, the other in competition with other dealers—and that the dual ownership, instead of removing a buyer from the market in this major market area has added one to it, and thus had provided a competitive advantage to the producers. It is the Secretary, in prohibiting the Habibs from continuing to conduct both operations, who would actually remove a buyer from this market area.

If, in this confrontation of fact with possibility, the latter is to be held to prevail, that judgment must be based on facts bearing on the Habibs and a considered balancing of the benefits and evils that their method of doing business may be shown to have presented to the producers. Only after such a factually based evaluation by the Secretary can it be said that he has shown that the consequence of the dual operations of the Habibs, all aspects taken into consideration, is likely to be injury to the producer of the sort the Act is designed to prevent. Such an evaluation was not conducted here.

Reversed.

GOODWIN, Circuit Judge (dissenting):

I would affirm the Secretary's order.

In order to facilitate market regulation, Congress has invested certain executive agencies with broad powers. For example, Congress intended that the Federal Trade Commission be accorded wide latitude in its assessment of unfair trade practices. *FTC v. Brown Shoe Co.,* 384 U.S. 316, 86 S.Ct. 1501, 16 L.Ed.2d 587 (1966). The FTC can "define and proscribe an unfair competitive practice, even though the practice does not

infringe either the letter or the spirit of the antitrust laws." *FTC v. Sperry & Hutchinson Co.,* 405 U.S. 233, 239, 92 S.Ct. 898, 903, 31 L.Ed.2d 170 (1972).

Significantly, the prohibitions of sections 202(a) and 312(a) of the Packers and Stockyards Act, 7 U.S.C. §§ 192(a) & 213(a), were intended to be as rigorous, if not more rigorous, that those imposed under § 5 of the Federal Trade Commission Act, § 2 of the Clayton Act, and the various sections of the Sherman Antitrust Act. *Wilson & Co. v. Benson,* 286 F.2d 891 (7th Cir. 1961). *See also,* 61 Cong.Rec. 1805. The Packers and Stockyards Act is remedial legislation. *Stafford v. Wallace,* 258 U.S. 495, 521, 42 S.Ct. 397, 66 L.Ed. 735 (1922). It should be liberally construed in order to fully carry out its public purpose: protection of producers and consumers from economic harm at the hands of middlemen. *Bruhn's Freezer Meats v. United States Department of Agriculture,* 438 F.2d 1332, 1336 (8th Cir. 1971).

In deciding what level of proof is required under the Act to characterize an activity as "unfair", the courts have inquired whether the questioned conduct necessarily offends a central purpose of the Act. *See Armour & Co. v. United States,* 402 F.2d 712, 717 (7th Cir. 1968). The Seventh Circuit has suggested that the Secretary has broad powers of prohibition with regard to trade practices that conflict with the basic policies of the various antitrust statutes, "even though the practices may not actually violate those statutes * * *. (Citation omitted.)" *Armour & Co. v. United States,* 402 F.2d at 717. This is fully consistent with the powers recognized in the FTC. In the instant case, the department had ample evidence that packer-dealer coownership does potentially threaten a central purpose of the statute.

I find no implied authorization in the section governing *dealers,* 7 U.S.C. § 213, for a dealer to act as a packer; but there is a bar on "unfair practices" which mirrors

cient for the same reasons. Otherwise, generalized expert testimony as to the mere specter of these evils would allow conduct of the sort

involved here to be deemed a violation of the Act without regard to the actual likely effect of such conduct.

subsection (a) of 7 U.S.C. § 192, the packer statute. Coownership here must be tested for compliance with both the dealer and packer statutes.

Subsections (c) and (d) of 7 U.S.C. § 192 speak not to packer-dealer identity but to dealer-like activities by an entity plainly identifiable as a packer. I see no inconsistency between absolute prohibition of coownership under § 192(a) (or § 213(a)) and a prohibition under § 192(c) or (d) conditioned on proof of anticompetitive purpose or effect. Distinctions of this type are not unusual in a regulatory scheme as broadly endowed by Congress as this one is.

If I were Secretary, I might not have considered the anticompetitive potential in this case to be as grave as the incumbent apparently has considered it, but I am content to leave the decision in his hands.