**CORONA LIVESTOCK AUCTION, INC., Petitioner,**

v.

**UNITED STATES DEPARTMENT OF AGRICULTURE and the Packers and Stockyards Administration, Respondents.**

**No. 77–3203.**

United States Court of Appeals, Ninth Circuit.

April 23, 1979.

Rehearing Denied Aug. 3, 1979.

Richard A. Koehler, Geneva, Neb., for petitioner.

William Kanter, Raymond W. Fullerton, Washington, D. C., for respondents.

Before HUFSTEDLER and WALLACE, Circuit Judges, and HAUK,* District Judge.

WALLACE, Circuit Judge:

Corona Livestock Auction, Inc. (Corona) petitions for review of a cease and desist order entered against it by the judicial officer on behalf of the Secretary of Agricul-

* Honorable A. Andrew Hauk, United States District Judge, Central District of California, sitting by designation.

ture. At issue is Corona's unique method of selling culled dairy cows for slaughter, which the Secretary claims violates sections 304, 307, and 312(a) of the Packers and Stockyards Act of 1921, as amended, 7 U.S.C. §§ 205, 208, and 213(a) (1970) (the Act), and 9 C.F.R. § 201.58.[1] An administrative law judge found in favor of Corona but on review, the judicial officer, after requesting additional evidence, entered a cease and desist order. Because we conclude that the judicial officer's findings are not supported by substantial evidence, we grant the petition for review and reverse his decision.

I

Corona is both a registered market agency and dealer regulated under the Act. During the period in question it sold slaughter cows through Stanley, its president, general manager, and half-owner. The judicial officer found that Stanley would weigh and set a price for each animal, "based on his own judgment of a proper or fair value of the animal." The judicial officer's findings of fact further described Corona's selling method:

At a sale of slaughter cows the buyers would congregate around Stanley who would announce to the group the animal and the price he had fixed. When an animal was offered for sale it was first offered according to an announced schedule to the first buyer on the schedule at the predetermined price. The schedule always listed [four named] packing companies, but, on occasion, included other buyers, some of whom were not present. The buyers on the schedule rotated with each animal so that each was regularly given a first opportunity to purchase. If the first buyer refused the particular animal, it was offered to the next in turn on the schedule at the same price and so on until sold to one of them. When an animal was offered to one of the four buyers, another turn buyer could not bargain or bid for the animal, and he would have no opportunity to buy the animal unless and until the original offeree rejected it, and it was his turn to buy. After each of the four had been offered an animal, the turn began again.

In the event none of the buyers on the schedule wanted a particular animal it was then offered to anyone else present

1. In the 1970 version of the United States Code, in effect at the time this action was commenced, these sections stated in part:

7 U.S.C. § 205:

All stockyard services furnished pursuant to reasonable request made to a stockyard owner or market agency at such stockyard shall be reasonable and nondiscriminatory and stockyard services which are furnished shall not be refused on any basis that is unreasonable or unjustly discriminatory
. . . . .
7 U.S.C. § 208:

(a) It shall be the duty of every stockyard owner and market agency to establish, observe, and enforce just, reasonable, and nondiscriminatory regulations and practices in respect to the furnishing of stockyard services, and every unjust, unreasonable, or discriminatory regulation or practice is prohibited and declared to be unlawful.

(b) It shall be the responsibility and right of every stockyard owner to manage and regulate his stockyard in a just, reasonable, and nondiscriminatory manner, to prescribe rules and regulations and to require those persons engaging in or attempting to engage in the purchase, sale, or solicitation of live-

stock at such stockyard to conduct their operations in a manner which will foster, preserve, or insure an efficient, competitive public market. Such rules and regulations shall not prevent a registered market agency or dealer from rendering service on other markets or in occasional and incidental off-market transactions.

7 U.S.C. § 213:

(a) It shall be unlawful for any stockyard owner, market agency, or dealer to engage in or use any unfair, unjustly discriminatory, or deceptive practice or device in connection with determining whether persons should be authorized to operate at the stockyards, or with the receiving, marketing, buying, or selling on a commission basis or otherwise, feeding, watering, holding, delivery, shipment, weighing, or handling, in commerce, of livestock.

The text of 9 C.F.R. § 201.58 states in part:

Every market agency and licensee engaged in the business of selling livestock or live poultry on a commission or agency basis shall sell the livestock or live poultry consigned to it openly, at the highest available bid, and in such manner as to best promote the interests of the consignors.

at the sale on a first acceptance basis. Stanley on occasion, however, would either buy an animal for the account of a purchaser not present for whom he acted as agent, or on the rare occasions when it was not otherwise sold, he would buy it for his market, i. e., for market support purposes, to be resold later. There was no negotiation of price at any time, in the manner of bidding or making a counteroffer. A purchaser either accepted the animal at Stanley's price or not. Once set, Stanley did not change his price on a particular animal.

. . . . .

. . . Stanley testified that he made up the schedule with consideration for the type of available animals and particular purchaser requirements. In many instances, however, consigned slaughter cows were sold to three of the packers referred to [above] . . . not just according to their needs for a particular type of slaughter cow, but according to a conscious plan by Stanley to divide the available cows by offering and selling them in sequence to respondent's important customers. Stanley testified that he operated his sales so that all of the potential purchasers had an opportunity to buy some cattle. No one purchaser could buy all of the cattle. Stanley testified, in substance, that he operated in a manner designed to satisfy all of the purchasers' needs insofar as he could with the animals available.

. . . The prices fixed by Stanley were always on the whole or half dollar per hundredweight.[2]

The judicial officer concluded that the Corona system was "unfair, unreasonable, and unjustly discriminatory" because

(i) it necessarily results in prices that are lower than could be obtained if buyers were permitted to express their buying demand in some type of competitive marketing system; and (ii) buyers who are willing to pay a higher price for slaughter cows are not permitted to buy all of the cows they want to purchase but must, instead, be satisfied with the animals they are permitted to buy under a turn system.

An additional element of respondent's selling method which results in lower selling prices than could otherwise be obtained is that respondent prices slaughter cows only on an even dollar or half dollar, thereby precluding an additional 10 cents, 25 cents, etc., on an animal . . . ..

His decision was based largely upon a comparison of the Corona method with two major public stockyard selling practices approved by the Secretary, the auction and private treaty systems. In an auction, all prospective buyers can bid against each other, and the highest bidder purchases the livestock. In a private treaty sale, the seller selects whom he believes to be the best buyer and they negotiate in private. If they come to no agreement, the seller selects and negotiates in private with subsequent buyers in an effort to make a sale.[3]

---

**2.** Corona disputes one aspect of this description: that Stanley fixed and strictly adhered to a schedule of buyers.

**3.** The judicial officer stated in his written disposition:

In a private treaty sale, the prospective purchasers gather at the head of a commission firm's alley. Prior to the sale, the commission firm sorts each consignment into uniform lots, which are placed in separate pens. A good commission firm salesman knows what types of livestock are needed by particular buyers, and he has an opportunity to visit with the buyers before the sale begins. The salesman selects the buyer whom he believes to be the best buyer for a particular lot of livestock and takes that buyer into the pen (or pens) and negotiates in secret with him as to the price. No buyer knows exactly what the other potential buyers will bid. Thus, each buyer entering the pens must bid as high as he believes is necessary to purchase the livestock. At a private treaty sale, there is haggling over the price between the buyer and the seller. If they agree on a price, the sale is consummated. If not, the salesman takes another buyer into the pen and negotiates secretly with him as to the price. The salesman's offering price to the subsequent buyers may be higher or lower than the price involved in the negotiations with the previous buyers. Where a commission salesman has no good basis for selecting one buyer over another, on occasion he will flip a coin to determine the order in which the

The private treaty method does not, according to the judicial officer's written disposition, require that all interested buyers have a chance to bid before the sale is made.[4]

Corona bases its challenge to the order principally on deficiencies in the expert testimony upon which the judicial officer relied.[5] Corona relies upon our decision in *Central Coast Meats, Inc. v. United States Dep't of Agriculture*, 541 F.2d 1325 (9th Cir. 1976), in which we held that the Secretary had not shown that the petitioners' dual ownership of both packer and dealer operations was "likely to produce the sort of injury the Act is designed to prevent." *Id.* at 1327. Corona argues that the expert testimony supporting the judicial officer's findings was no more than "generalized expert testimony as to the mere specter of . . . evils" which we thought insufficient to show that conduct prohibited by the Act is likely to occur, *id.* at 1327 n. 2.[6] The judicial officer stated, however, that "the expert testimony in this case is more than adequate to resolve the matter," and that

"complainant's expert testimony relates directly to the facts in this case and does not suffer from the infirmity noted in *Central Coast Meats*." Thus the first question presented, and the only one we need reach,[7] is whether the evidence is sufficient to support the judicial officer's findings. We conclude that it is not.

## II

■ Our review is limited to determining whether substantial evidence supports the judicial officer's factual findings. *Fairbank v. Hardin*, 429 F.2d 264, 267 (9th Cir.), *cert. denied*, 400 U.S. 943, 91 S.Ct. 244, 27 L.Ed.2d 247 (1970). The evidence may be substantial even if two inconsistent conclusions might have been drawn from it. *Id.* "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938).[8]

purchasers will have an opportunity to negotiate for livestock in a particular pen or alley.

In a private treaty sale, if the livestock are sold to the first buyer who is taken into the pen, the other buyers do not have an opportunity to bid on the livestock. But all buyers had the opportunity to make known to the salesman their particular buying needs that day and, therefore, they all had an opportunity to try to influence the seller into selecting them as the first potential purchaser.

4. At oral argument, counsel for the Secretary told us that the private treaty method, if operated as approved by the Secretary, requires that all interested buyers have the opportunity to bid privately before a sale is made. This differs materially from the description set forth by the judicial officer. However, we understand neither counsel's oral argument nor the Secretary's brief to claim that the judicial officer was in error as to the Secretary's view of the proper operation of the private treaty method. The Secretary cannot have it both ways. We will rely on the judicial officer's description of this method, for among the questions before us is the substantiality of the evidence justifying his distinction between the Corona method and the private treaty method.

5. This testimony was originally excluded by the administrative law judge. The judicial officer remanded the case for the purpose of receiving the testimony before making the ruling now before us.

6. In *Central Coast Meats*, we assumed, without deciding, that 7 U.S.C. § 192(a), not in question here, requires only a showing of likely, rather than actual, injury "of the sort the Act is designed to prevent." 541 F.2d at 1327. It appears to us that in finding Corona's method "necessarily results" in prices lower than those of a competitive system, the judicial officer may have used a standard closer to that of actual injury. We see no need, however, to decide the question. Under the circumstances of this case, we make the same assumption that a showing of likely injury is all that is required with respect to the sections involved here. Even when viewed by this assumed standard, again advocated by the Secretary, the evidence is insubstantial.

7. Because of our disposition, we need not comment upon Corona's argument that the judicial officer's reliance upon the testimony of agency experts was improper. For the same reason, we do not reach Corona's procedural challenges to the Secretary's method of dispute resolution.

8. We need not seek substantial evidence supporting these findings in evidence upon which the judicial officer did not rely. He rejected both parties' statistical evidence and placed little weight on the testimony of producers who employed Corona. While it is our duty to look to the whole record to determine whether sub-

We first examine the finding that the Corona method "necessarily results" in prices lower than those obtained through the auction or private treaty methods. The judicial officer's written disposition and the expert testimony which he quoted therein indicate that, among other things, he was concerned that Stanley would not have sufficient information with which to set the highest price obtainable. Expert witness Stoddard testified, for example, that "Corona [does] not [get] price signals of increased strength from the wholesale market or from differing demands of individual packers," and that "[c]onsignors get true value only when that is coincidentally the price set on the animal by Corona." It does appear from the record that the prices set by Stanley may not always have been the highest that he could have obtained. Nonetheless, we find no testimony which demonstrates that Stanley's use of judgment led or was likely to lead to lower prices than those obtained in the private treaty system, in which the seller may decide to sell to the first buyer with whom he deals, and may do so without further buyer input.[9]

A second factor apparently relied upon by the judicial officer similarly fails to demonstrate that the Corona method led or was likely to lead to such lower prices. Expert witness Mund testified that "[i]n the Corona authoritarian method of selling, the market authority seeks to make and strives to make a price so that all interested buyers can buy some animals. . . . The market authority must make prices low enough to equal the valuations of the least interested buyer who will buy." These theoretical assertions cannot replace the "factually based evaluation" we required in *Central Coast Meats*, 541 F.2d at 1328.

We have similar difficulty with the same expert's opinion that a turn system, such as Corona's, is evidence of low pricing. The flaw in this testimony is that it merely assumes that Stanley operated, or was likely to operate, in a manner consistent with economic theory. Likewise, the judicial officer's statement that Stanley's practice of using half- or even-dollar selling increments also led to lower prices rests at best on the assumption that Stanley would price or was likely to price at the lower increment. Again, this will not suffice to condemn his practice.

Taken as a whole, the expert testimony raises nothing more than the mere specter of evils we criticized as inadequate in *Central Coast Meats*, 541 F.2d at 1327 n. 2. There is no substantial evidence in the record demonstrating that the prices set by Stanley were likely to be or actually were lower than those obtained in the private treaty system.

Finally, we review the finding that buyers willing to pay a higher price for slaughter cows were not permitted to buy all the cows they wanted to purchase. Substantial evidence also fails to support this finding. We are aware that Stanley testified that "I do not think that we should give [the cows] all to one packer, and as long as I am in the business I am not going to give them to one packer." Yet there is nothing to indicate that a buyer willing to pay a higher price for all the cattle or more than the cattle available to him under Stanley's system existed or was even likely to exist. Just as we found lacking in *Central Coast Meats* "specific evidence relating to the probability of other bidders' entry into the particular mar-

stantial evidence supports the officer's findings, *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–88, 71 S.Ct. 456, 95 L.Ed. 456 (1951), we think this is unnecessary where, as here, the judicial officer specifically indicates the testimony he has rejected or discredited and we fail to find substantial evidence in the remaining testimony. To attempt to look beyond the evidence on which he placed reliance to that to which he gave little or no weight in order to support his findings would, in effect, constitute a new weighing of the evidence, a

task particularly within the Secretary's expertise, *e. g., Aikins v. United States*, 282 F.2d 53, 57 (10th Cir. 1960).

**9.** Quite clearly, both the Corona and private treaty systems involve some exercise of judgment on the seller's part. Stanley exercises judgment when he sets his price. Similarly, the private treaty dealer exercises judgment when he decides to sell to a particular, even perhaps the first, buyer.

kets involved," 541 F.2d at 1327 n.2, so here nothing indicates that market conditions were likely to be such that a buyer willing to pay a higher price would be unable to purchase all he wanted. While we have indicated that the price which Stanley set may not always have been the highest obtainable, there is no substantial evidence that any buyer was likely to have been denied the supply his greater buying power could bring him.

■ Simply put, the judicial officer's findings of fact were made without the "factually based evaluation" we held in *Central Coast Meats* to be necessary for a showing that injury "of the sort the Act is designed to prevent" is at least likely, 541 F.2d at 1328. We cannot uphold his decision. While Stanley appears to be a unique individual, and the Corona method is somewhat different from those approved by the Secretary, these circumstances alone do not provide a sufficient basis for finding a violation of the Act.

PETITION FOR REVIEW GRANTED; DECISION OF THE JUDICIAL OFFICER REVERSED.