**Leon FARROW, an individual, Knoke Livestock Buyers, Inc., a corporation, and Thomas Lenz, an individual, Petitioners,**

v.

**UNITED STATES DEPARTMENT OF AGRICULTURE, John R. Block, Secretary, Respondents.**

**No. 83–2548.**

United States Court of Appeals, Eighth Circuit.

Submitted April 13, 1984.

Decided April 24, 1985.

---

Robert Malloy, Goldfield, Iowa, for petitioners.

Virginia Strasser, U.S. Dist. Atty., Washington, D.C., for respondents.

Before LAY, Chief Judge, FAIRCHILD, Senior Circuit Judge,* and McMILLIAN, Circuit Judge.

FAIRCHILD, Senior Circuit Judge.

This case is before us on a petition for review of a decision and order of the Judicial Officer (JO) of the Secretary of the United States Department of Agriculture finding petitioners in violation of § 312(a) of the Packers and Stockyards Act, 7 U.S.C. § 213(a), and implementing Regulation 9 C.F.R. § 201.70 (1984). The order required petitioners to cease and desist from described practices and suspended them as registrants under the Act for a period of forty-five days.[1]

Petitioners Leon Farrow and Knoke Livestock Buyers, Inc., are registered dealers under the Act authorized to buy and sell livestock in commerce; Thomas Lenz manages Knoke Livestock and is its principal stockholder.[2]

The present dispute centers around the sale of "pound cows" at the Algona Livestock Auction and Exchange in Algona, Iowa.[3] Knoke Livestock and Farrow are regular buyers at the Algona market. The purchase of pound cows is only a small part of their businesses.

On April 7, 1981, an officer of the Department of Agriculture filed an administrative complaint against petitioners. The complaint alleged that petitioners willfully violated 7 U.S.C. § 213(a) and Regulation 9 C.F.R. 201.70 by entering into and carrying out an agreement not to compete against each other in the purchase of pound cows at the Algona market in early 1980. In substance, petitioners claimed that their arrangement was aimed at saving transportation costs on pound cows. Joint trucking of pound cows for the 150 miles to the slaughterhouse would be far more economical.

Section 312(a) of the Packers and Stockyards Act makes it unlawful for any dealer to engage in or use any unfair practice in connection with the buying of livestock. 7 U.S.C. § 213(a). Regulation 201.70, one of the regulations promulgated by the Depart-

---

* Honorable Thomas E. Fairchild, Senior Circuit Judge of the United States Court of Appeals for the Seventh Circuit, sitting by designation.

1. A stay of the JO's order was granted on October 17, 1983.

2. An *amicus curiae* brief arguing for the setting aside of the JO's decision was submitted by the Livestock Marketing Association.

3. Pound cows are unproductive or unhealthy cows culled by farmers and sold by the pound for slaughter. On a typical day the sale of pound cows comprises less than 5% of cattle sold at the Algona market. Sales at Algona are held weekly.

ment to define unfair or deceptive practices under the Act, provides:

> Each packer and dealer engaged in purchasing livestock, in person or through employed buyers, shall conduct his buying operations in competition with, and independently of, other packers and dealers similarly engaged.

9 C.F.R. § 201.70 (1984).[4]

After hearing, the ALJ found that the agreement between Knoke and Farrow was an accommodation for transportation, was not for the purpose of controlling prices or lessening competition in the purchase of pound cows, and did not have that effect. The ALJ concluded that no violation had been shown and dismissed the complaint.

The agency appealed the ALJ's decision to the JO. *See* 5 U.S.C. §§ 556, 557; 7 C.F.R. § 2.35 (1984). The JO found that Knoke and Farrow had been the principal buyers of pound cows at Algona, but had "entered into an agreement that (i) ... Farrow would buy the pound cows at Algona when he was present, (ii) ... Knoke would refrain from buying pound cows at Algona when ... Farrow was present, and (iii) [Knoke and Farrow] would share the profits on the pound cows." Concluding that the agreement and conduct under it constituted an unfair practice under § 213(a), (as well as a violation of 9 C.F.R. § 201.70) he issued a cease and desist order.

Characterizing the violations as "intentional, flagrant, and serious" as well as "wilful" he suspended Farrow and Knoke as registrants for forty-five days, a sanction he characterized as "severe," and which petitioners say could bankrupt them.

■ The findings of the Secretary of Agriculture (here the JO) must be sustained by this court if supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. Labor Bd.*, 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951) (quoting *Consolidated Edison v. Labor Board*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)). *See also Mattes v. United States*, 721 F.2d 1125, 1129 (7th Cir.1983); *Western Iowa Farms Co. v. United States*, 629 F.2d 502, 504–05 (8th Cir.1980); *Corona Livestock v. U.S. Dept. of Agriculture*, 607 F.2d 811 (9th Cir.1979). This substantial evidence standard is not rendered inapplicable when the JO and ALJ disagree. The JO, sitting in review of an ALJ's initial decision, is authorized by statute "to substitute its judgment for that of the ALJ." *Mattes*, 721 F.2d at 1129.

■ We have little difficulty concluding that there was sufficient evidence to support the JO's finding that Knoke and Farrow made an agreement with the terms he described. We agree that an effect of such an agreement was that Knoke and Farrow would not bid competitively in purchasing pound cows at Algona, although they had previously done so. The analysis of their purchases of pound cows at the sales from March 3 to July 21, 1980 showed a uniform pattern, with one negligible exception. There were 19 sales during this period. Farrow was present and bought pound cows at each of 15 of them. His purchases ranged from four to 39. Knoke bought only one pound cow at one of the 15 sales (April 21) and none at any of the rest. A Knoke representative was present at all these sales. Farrow's records for three sales in March and three in June showed that the cows he purchased were trucked to a packer at Omaha, and he remitted half the profit to Knoke. Farrow was not present at four of the 19 sales. At those four Knoke bought pound cows, ranging in number from four to 32. There was testi-

---

4. As stated in the Department's brief:

> While these regulations have been interpreted as purely advisory, so that a violation of the regulations is insufficient to prove a violation of the Act, they nonetheless serve to give notice of the Secretary's interpretation of what constitutes an unfair practice and should be given great weight. *United States v. Donahue Bros., Inc.*, 59 F.2d 1019, 1022–23 (8th Cir. 1932).
>
> See also reference to "advisory" regulations in *Central Coast Meats v. U.S. Dept. of Agriculture*, 541 F.2d 1325, 1326 (9th Cir.1976).

mony of observers, and evidence of admissions indicating that they did not bid against each other for pound cows. It could be readily inferred from the circumstances that they agreed that one or the other would buy for the account of both, and that profits would be split. It is highly improbable that this pattern would have been evident without agreement. As a result of this evidence, we must accept the JO's finding of an agreement which resulted in their not bidding against each other for pound cows.

The record does not show the total number of pound cows sold at each Algona sale, but the ordinary range is between 15 and 45. Although there were three other dealers who bought, there is evidence to support the JO's finding that Knoke and Farrow were the principal buyers of pound cows at Algona. We can agree with the JO that elimination of one of the principal buyers as an active bidder tended to reduce competition at the Algona sales and, as a result, created a likelihood that the prices at which the cows were purchased would be reduced.

There was testimony of observers that the price paid at Algona for pound cows during this period was the top, best, and fair price. The ALJ, who saw and heard the witnesses, credited this testimony. The JO conceded that there was no direct evidence that prices were adversely affected, but wrote that he drew the inference that they were.

We agree with the JO that a practice which is likely to reduce competition and prices paid to farmers for cattle can be found an unfair practice under the Act, and be a predicate for a cease and desist order. We conclude that this is so even in the absence of evidence that the participants made their agreement for the purpose of reducing prices to farmers or that it had that result.

Seven U.S.C. § 213(a) and 7 U.S.C. § 192(a), which deals with the behavior of packers and poultry dealers and handlers, authorize the Secretary of Agriculture to regulate anticompetitive trade practices in the livestock and meat industry in accord with "the basic antitrust blueprint of the Sherman Act and other pre-existing antitrust legislation such as the Clayton Act and the Fair Trade Commission Act." *De Jong Packing Co. v. U.S. Dept. of Agriculture*, 618 F.2d 1329, 1335 n. 7 (9th Cir. 1980).

These provisions have been liberally construed so as to give effect to the remedial purposes of the Packers and Stockyards Act. *See, e.g., Central Coast Meats v. U.S. Dept. of Agriculture*, 541 F.2d 1325, 1328 (9th Cir.1976) (Goodwin, *J.*, dissenting); *Armour and Company v. United States*, 402 F.2d 712, 722 (7th Cir.1968); *Swift & Company v. United States*, 393 F.2d 247, 253 (7th Cir.1968). This reading is consistent with this court's observation in *Rice v. Wilcox*, 630 F.2d 586 (8th Cir. 1980), that the Packers and Stockyards Act "should be broadly construed to give the Secretary of Agriculture the authority to deal with any practices that inhibit the fair trading of livestock by stockyards, market agencies, and dealers." *Id.* at 590. *See also Bruhn's Freezer Meats v. United States Dept. of Agr.*, 438 F.2d 1332 (8th Cir.1971).

A practice is "unfair" under § 213(a) if it injures or is likely to injure competition. *De Jong Packing*, 618 F.2d at 1336–37, and cases cited therein. The JO concluded that petitioners' agreement to combine in bidding on pound cows injured or was likely to injure competition for pound cows at the Algona market.

The potential anticompetitive effect of collusive bidding arrangements has been recognized in cases arising under 7 U.S.C. §§ 192(a) and 213(a). In *Berigan v. United States*, 257 F.2d 852 (8th Cir.1958), this circuit upheld a JO's finding that a "turn system," in which dealers flipped coins for the right to bid on cattle, was an unreasonable restraint on competition in violation of § 213(a). The turn system determined the order in which bids would be received and limited the number of bidders to three. The court concluded this system deprived producers and consumers of free competi-

tion, creating the potential for dealers to collude on price. *Id.* at 859. *See also Aikins v. United States,* 282 F.2d 53 (10th Cir.1960) (finding turn system in violation of § 213(a) because it limited the number of prospective buyers). Other bidding arrangements have been found anticompetitive by the Seventh Circuit. *In Swift & Company v. United States,* 393 F.2d 247 (7th Cir.1968), two meat packing companies with buyers in a local lamb market were found to have agreed to refrain from bidding against the area's principal dealer in violation of Regulation 201.70 and § 192(a). The Seventh Circuit concluded that the action of the packers might be characterized as a simple refusal to deal (with lamb producers), conduct permitted by the Sherman Act. *Id.* at 253. Nevertheless, the court upheld the JO's finding of a violation. The court found "[t]he lack of competition between buyers, with the attendant possible depression of producers' prices, was one of the evils at which the Packers and Stockyards Act was directed." *Id.* at 254. The Seventh Circuit reached a similar conclusion earlier. *See Swift & Company v. United States,* 308 F.2d 849 (7th Cir.1962). In that case Swift and another hog buyer, who had been in competition, agreed to bid on and buy together all top grade hogs sold at a local market. The court concluded the "essential nature and the necessary result of this arrangement or practice was to eliminate competition." *Id.* at 853.

Petitioners attempt to distinguish these bidding arrangements from the agreement at issue, pointing out that in the two *Swift* decisions there was at least some evidence of an actual depression of the price paid for stock. Here, they argue, the agency made no showing that the price for pound cows was actually depressed by the agreement. Indeed, petitioners point out that two livestock dealers familiar with the Algona market and the owner of the market testified the prices were competitive with other cattle markets during the first half of 1980 when the agreement was in effect. The ALJ relied on this testimony to find the agreement had no impact on price.

▮ The Packers and Stockyards Act does not require that the Secretary prove actual injury before a practice may be found unfair. "[T]he purpose of the Act is to halt unfair trade practices in their incipiency, before harm has been suffered." *De Jong,* 618 F.2d at 1336–37. *See also Swift & Company,* 393 F.2d at 253; *Armour and Company v. United States,* 402 F.2d 712, 723 n. 12 (7th Cir.1968). *Cf. FTC v. Brown Shoe Co.,* 384 U.S. 316, 322, 86 S.Ct. 1501, 1504, 16 L.Ed.2d 587 (1966) (FTC has power "to arrest trade restraints in their incipiency without proof that they amount to an outright violation of … other provisions of the antitrust laws"). Accordingly, the Secretary need only establish the likelihood that an arrangement will result in competitive injury to establish a violation.

Petitioners rely on *Corona Livestock v. U.S. Dept. of Agriculture,* 607 F.2d 811 (9th Cir.1979) and *Central Coast Meats v. U.S. Dept. of Agriculture,* 541 F.2d 1325 (9th Cir.1976). In those cases the Ninth Circuit reversed JO orders. The practices considered were quite different and the court concluded, ultimately, that there was no sufficient showing that producers were likely to be injured by them. Here the two regular, principal buyers in a market, though small, who had bid competively for animals of a particular class, made an agreement which resulted thereafter in one of them bidding for both.

▮ *Amicus* Livestock Marketing Association suggests that the Packers and Stockyards Act of 1921 was never intended strictly to regulate the conduct of dealers but rather to control the anticompetitive practices of the then five major meatpackers in the United States. This, it suggests, explains why the competitive practices of packers and dealers are regulated under distinct sections of the Act. *Amicus* appears to argue that it is therefore appropriate to require the Secretary to make a greater showing of anticompetitive effect in the case of an agreement limiting competition by small, regional dealers under § 213(a) than in the case of large, national

packers under § 192(a). We are unpersuaded.

Petitioners were faced by a problem of escalating trucking costs. Pound cows at Algona were few in number. They could be sold only for slaughter and the packer was 140 to 150 miles away, in Omaha. The cost of trucking had come to be $1.80 per mile, or about $270 per truck trip. Petitioners could save costs by combining cows for shipments. Saving costs would produce a margin which would at least make it possible for them to pay better prices. Unfortunately they chose a solution which left the buying to one of them although both shared the profit. This can be found to endanger competition. A different solution might have been worked out, not involving bidding by only one for the benefit of both.

There was no evidence that the method was selected for the purpose of buying cows for less money, nor that it had that effect. The ALJ was satisfied that petitioners' relationship was an accommodation for transportation and in fact had no material effect on the prices paid for cows. In evaluating evidence in order to determine whether there is substantial evidence to support the JO's decision, we give appropriate consideration to the different conclusions reached by the ALJ who saw and heard the witnesses. *See Universal Camera Corp. v. Labor Bd.*, 340 U.S. 474, 496, 71 S.Ct. 456, 468, 95 L.Ed. 456 (1951).

We sustain the JO's cease and desist order on the basis that petitioners' agreement and practice posed a danger of reduction of prices to farmers, resulting from a diminution of competition. We do not sustain any finding that petitioners intended to cause a price reduction by this practice or that prices were reduced.

Petitioners contend that suspension of their entire operations for forty-five days would be fatal to their businesses. The JO acknowledged that his order is a "severe" sanction. He considered it justified under Department policy because the violations were "intentional, flagrant, and serious" and because petitioners must have known that their agreement was unlawful.

The record contains no support for deeming the violations intentional, flagrant, or serious, or that petitioners were aware of unlawfulness.

We are mindful that nothing in 7 U.S.C. § 204, authorizing suspensions, "confines its application to cases of 'intentional and flagrant conduct' or denies its application in cases of negligent or careless violations." *Butz v. Glover Livestock Comm'n Co.*, 411 U.S. 182, 187, 93 S.Ct. 1455, 1458, 36 L.Ed.2d 142 (1973). *Butz* was a case where the suspension order was based on violations committed in disregard of previous warnings, not present here. The Supreme Court also expressed doubt as to this court's premise that the Secretary's practice was to impose suspensions only in cases of intentional and flagrant conduct.

Here, however, the JO's decision indicates that under Department policy the admittedly severe order is predicated on the violation being flagrant and serious.

Although we think it the sounder view that the agreement between the two principal buyers at a small sale can be deemed an unfair practice, we have found no case on all fours. We acknowledge that a different view of this matter is at least plausible. The ALJ concluded there was no violation.

We cannot sustain the JO's view that petitioners must have known their agreement was unlawful.

Accordingly, we affirm the part of the order which commands petitioners to cease and desist from conduct, but set aside that part which suspends them as registrants. No party shall recover costs in this court.