REAVLEY, Circuit Judge:
Once more a federal court is called to say that the purpose of the Packers and Stockyards Act of 1921 is to protect competition and, therefore, only those practices that will likely affect competition adversely violate the Act. That is this holding.
This appeal is concerned only with § 202 of the Packers and Stockyards Act (“PSA”) enacted in 1921[1] to cope with market control of the meat packing industry by five companies. That section as it stands today, codified as 7 U.S.C. § 192, is set forth in the appendix and referred to hereafter as codified. Congress has amended the PSA multiple times since its passage, including additional provisions and refining much of its scope, changing jurisdiction of federal agencies and bringing additional industries under protection, standing today as 7 U.S.C. § 181 — § 229c. The language at issue in this case in § 192(a) and (b) remains as originally enacted without any significant change.

This Appeal

Plaintiffs “grow” chickens for the defendant poultry producer and brought this suit with several claims that included the defendant’s “deceptive, unlawful, unfair, capricious, arbitrary and discriminatory” conduct in violation of § 192(a) and (b). A specific complaint was that another grower was given a contract on preferable terms, violating the PSA because it was an unfair and deceptive trade practice. The defendant moved for summary judgment, arguing in part that the PSA requires a showing that the alleged practices have an adverse effect on competition. The district court denied the motion, holding that no showing of adverse effect on competition is necessary under § 192(a) or (b) of the PSA. That court then allowed an interlocutory appeal under 28 U.S.C. § 1292(b) to decide the question of “whether a plaintiff must prove an adverse effect on competition in order to prevail under 7 U.S.C. §§ 192(a)-(b).” This court granted permission to appeal.
A panel of this court held that a plaintiff need not prove an adverse effect on competition to prevail under the statute. Wheeler v. Pilgrim’s Pride Corp., 586 F.3d 455 (5th Cir.2008). The en banc court granted rehearing and disagrees with the panel and district court.

Judicial History

The Supreme Court in 1922

The lengthy history in the courts began immediately after the PSA’s enactment with an effort to enjoin its enforcement because of unconstitutionality. The following year the Supreme Court upheld the PSA in Stafford v. Wallace.[2], Chief Justice Taft, author of the opinion for the Court, *358 recounted efforts of the government to protect sellers of cattle and purchasers of meat from the control of the purchase of live stock and preparation, distribution, and sale of meat products by the five great packing companies. As the Chief Justice said, “[i]t is helpful for us in interpreting the effect and scope of the Act in order to determine its validity to know the conditions under which Congress acted.”[3]
The Chief Justice introduced the PSA as regulating “the business of the packers done in interstate commerce and forbidding] them to engage in [using words of subsection (a)] unfair, discriminatory, or deceptive practices in such commerce, or to subject any person to unreasonable prejudice therein, or to do any of a number of acts to control prices or establish a monopoly in the business.”[4] He observed that the object of the PSA was to secure the flow of livestock from the farms and ranges to the slaughtering center and into meat products unburdened by collusion that unduly lowered the prices to the shipper and unduly increased the price to the consumer.
Then the opinion turns to previous cases, particularly the 1905 case of Swift & Co. v. United States,[5] where the Court enjoined violations of an anti-trust act of 1890 by those who refrained from bidding against each other in buying livestock and in fixing prices for the sale of fresh meat.
The Supreme Court concluded: “It is manifest that Congress framed the Packers and Stockyards Act in keeping with the principles announced and applied in the opinion in the Swift ease.”[6]
We read this 1922 opinion of the Supreme Court to decide the PSA to be constitutional because it protects competition and opposes combinations in restraint of interstate trade.

The Seventh Circuit

The Seventh Circuit, where great packing companies have resided, has fielded most of the early cases applying the PSA. In 1939 it set aside an order of the Secretary of Agriculture against preferential discounts and trades allowed to some customers and not to others. Swift & Co. v. Wallace.[7] The Secretary had declared that the fact of competition was not material, but the court held that the decision had to take into consideration the effect that this disparate treatment had upon competition between customers and between Swift and others. In 1961 that court upheld the Secretary’s order against a meat packer that had cut its prices to lessen or destroy competition with its competitor. Wilson & Co. v. Benson.[8] In reply to Wilson’s argument that its price-cutting was not for the purpose of acquiring a monopoly or eliminating a competitor, and that the PSA did not prohibit a mere competitive injury or lessening of competition, the court said that the legislative history of the PSA supported a wider power to prohibit unfair methods of competition than did antecedent anti-trust legislation. In 1962 the Seventh Circuit held that an agreement to allow a competitor to bid to purchase hogs for itself and another violated § 192(a) of the PSA because the result was to eliminate competition, where *359 as the packer’s dissemination of price information to its dealers did not violate the PSA because the purpose was to consummate a sale rather than to compete. Swift & Co. v. United States.[9]
In 1968 the Seventh Circuit set aside an order of the Secretary of Agriculture stopping Armour and Company from giving consumers of its bacon a 50-cent refund.[10] The Secretary deemed the practice to be unfair and a violation of § 192(a) of the PSA because its return on bacon sales was less than its costs. The court held that lack of fairness and an unreasonable preference did not prove a violation of (a) and (b) of the PSA because Armour’s refund program would not violate the Act absent an intent to eliminate competition or unless the effect might be to lessen competition. Lastly, the Seventh Circuit rejected a claim under the PSA for an “unfair and knowingly deceptive scheme” to sell “off-condition” hams, because there could be no legal claim under (a) of the PSA unless there was some intent to eliminate competition or unless the effect might lessen competition. Pac. Trading Co. v. Wilson & Co.[11]

Five Other Circuits

The Eighth Circuit in Farrow v. United States Department of Agriculture held that a practice which is likely to reduce competition may be an unfair practice in violation of the PSA, even in the absence of evidence that it had that result.[12] A later decision of that court, while affirming that rule, held that an agreement by feedlot owners to give a packing company a first refusal on the price for sale of cattle did not potentially suppress competition sufficiently to violate the PSA. IBP, Inc. v. Glickman.[13]
The Ninth. Circuit upheld the Secretary’s order against the practice of a group of packers who required auction stockyards to sell cattle subject to the cattle passing government inspection, holding that this was a conspiracy that created a likelihood that competitive harm would occur. Judge Sneed would have remanded for a further determination of the competitive effects. De Jong Packing Co. v. United States Dep’t of Agric.[14]
In Been v. O.K. Industries,[15] the Tenth Circuit had before it an appeal with the same question as the one before us: does § 192(a) require proof that a practice injures or is likely to injure competition? That court recognized that Congress had listed specific acts in subsections (c), (d) and (e) that expressly restrain competition whereas the same is not true of subsections (a) and (b), but concluded that this meant it was left to the courts to determine what anti-competitive practices could be unfair, unjustly discriminatory or deceptive. The Tenth Circuit followed the holding of the other federal courts addressing this issue to require a plaintiff who challenges a practice under § 192(a) to show that the practice injures or is likely to injure competition.
At trial of a case in the Eleventh Circuit the jury found that a poultry company had violated the PSA in terminating the plaintiffs’ poultry growing contracts without economic justification. The jury then awarded plaintiffs $164,000 in damages. *360 The district court set aside the award, granting judgment as a matter of law and holding that plaintiffs failed to show that the termination had an effect on competition. The Eleventh Circuit affirmed after reviewing the judicial history and said that “[ejliminating the competitive impact requirement would ignore the long-time antitrust policies which formed the backbone of the PSA’s creation.” London v. Fieldale Farms Corp.[16] The court concluded that the PSA required a plaintiff to show that the defendant’s deceptive or unfair practice adversely affects competition or is likely to adversely affect competition.
This rule was applied by the Eleventh Circuit in Pickett v. Tyson Fresh Meats, Inc.,[17] where a jury found that Tyson’s marketing agreement method of cattle purchases caused the price of the cash market method, used in purchasing from plaintiff, to be lower. The jury found that plaintiff suffered substantial financial injury. The trial court rendered judgment for Tyson, and the court of appeals affirmed, because the evidence established that Tyson had a legitimate business interest justification for the market method, consistent with its need to meet competition. The court reiterated that the purpose of the PSA was not to upset the traditional principles of freedom of contract. To which it could be added: despite an unfair effect on the plaintiffs.
The Fourth Circuit approved the trial court’s jury instruction requiring plaintiffs to prove defendants’ conduct was likely to affect competition adversely in order to prevail on their claims under § 192(a) of the PSA. Philson v. Goldsboro Milling Co.[18] This opinion is unpublished, perhaps because the court thought no further precedent was needed on this issue.

Congressional Experience and Acquiescence

An understanding of Stafford v. Wallace, as Chief Justice Taft told, and all of the judicial decisions noted above, becomes clearer the more we see the concerns and actions of Congress in enacting and amending the PSA over the years.
The story began with the growing control by five meat-packing conglomerates of the interstate food industries from 1890 to 1921.[19] Despite the Sherman Act and Justice Department actions, by 1916 the Big Five controlled eighty percent of all interstate commerce in the meat market and slaughtered forty percent of all animals used for food in America.[20] In 1917, President Woodrow Wilson directed the Federal Trade Commission to investigate the meat-packing industry to ascertain the facts about restraints of trade and what remedies could be taken.[21] In 1919, the Commission published a six-volume, three-thousand page report, explaining how the Big Five dominated the interstate meatpacking market through anti-competitive *361 monopolistic behavior.[22]
The PSA was the response of Congress. The legislative debate surrounding the PSA supports the conclusion that it was designed to combat restraints on trade, with everyone from the Secretary of Agriculture to members of Congress testifying to the need of this statute to promote healthy competition.[23] When asked specifically what kind of “unfair, unjustly discriminatory, or deceptive practices” the statute was designed to combat, one of the authors — Representative Sydney Anderson — cited predatory purchasing patterns, “wiring on,” and “split shipments,” all of which were anticompetitive acts which were restraints of trade.[24]
After 1921 and up to 2002, Congress has amended § 192 seven times without making any changes that would affect the many court interpretations cited above.[25] It is reasonable to conclude that Congress *362 accepts the meaning of § 192(a) to require an effect on competition to be actionable because congressional silence in response to circuit unanimity “after years of judicial interpretation supports adherence to the traditional view.” General Dynamics Land Sys., Inc. v. Cline.[26]

Role of the Secretary of Agriculture

When hearings were held on the original legislation, Henry C. Wallace, Secretary of Agriculture, testified in support of regulation of the meat-packing industry and said: “I believe in absolutely free competition. So far as you can do that by legislation I think it ought to be done[.]”[27] The PSA then provided for complaints of § 192 violations to be brought before the Secretary, who could order the violations to cease. Failure to obey his order was penalized. Appeals went to a circuit court.
In 1935 Congress added coverage of live poultry dealers or handlers to meat packers in the PSA. The Secretary is not delegated authority to adjudicate alleged violations of § 192 by live poultry dealers.[28] Enforcement is now in the hands of the Secretary and by private suit in federal court.[29]
The Secretary has at times interpreted the PSA to prohibit the forbidden practices regardless of whether competitive injury is caused. The Seventh Circuit has had to correct that interpretation in the cases discussed above. In Armour and Company v. United States the court explained that “Congress gave the Secretary no mandate to ignore the general outline of long-time antitrust policy by condemning practices which are neither deceptive nor injurious to competition nor intended to be so by the party charged.”[30]
The Government has appeared here as amicus to contend that the courts have had the PSA wrong and that it should be construed to make unfair practices unlawful without regard to competition. It urges Chevron[31] deference, but that is unwarranted where Congress has delegated no authority to change the meaning the courts have given to the statutory terms, as the Eleventh and Tenth Circuits have held.[32]

Decision

We conclude that an anti-competitive effect is necessary for an actionable claim under the PSA in light of the Act’s history in Congress and its consistent interpretation by the other circuits. The anti-competitive behaviors of the big meat packing companies of the 1920s motivated Congress to pass the Act, and the Supreme Court in Stafford v. Wallace concluded that the Act was constitutional because of the anti-competitive concerns of Congress. It is those concerns which remain paramount in the Act today and which led so many of the circuits to reach the same conclusion. We agree with the view that referring to outside sources may be inappropriate when determining the meaning of an unambiguous statute. It is *363 appropriate and necessary here, however, where § 192(a) and (b) of the PSA employs the terms “unfair,” “unjust,” “undue,” and “unreasonable.” Which meaning of “fair,” for example, do our dissenters choose in the four columns of Black’s Law Dictionary, Ninth Edition? It is apparent that these words do not “extend to the outer limits of [their] definitional possibilities.” Dolan v. U.S. Postal Service.[33] Rather, their meaning “depends upon reading the whole statutory text, considering the purpose and context of the statute, and consulting any precedents or authorities that inform the analysis.”[34] Given the clear antitrust context in which the PSA was passed, the placement of § 192(a) and (b) among other subsections that clearly require anticompetitive intent or effect, and the nearly ninety years of circuit precedent, we find too that a failure to include the likelihood of an anticompetitive effect as a factor actually goes against the meaning of the statute.
The law rules best by being predictable and consistent. It is predictability that enables people to plan their investments and conduct, that encourages respect for law and its officials by treating citizens equally, and that enables an adversary to settle conflict without going to court in the hope of finding judges who will choose a favored result. Predictability requires the judge deciding a case to set her course to reach the judgment that another, fully informed of the evidence and precedent, would expect. Predictability must be the lodestar. We must not be affected by personal preference, or by different notions of justice or what the law ought to be.
How then would an informed person predict the case before us to be decided? He would begin by expecting us to look to the opinions of other circuits for persuasive guidance, always chary to create a circuit split. Curr-Spec Partners, L.P. v. Comm’r;[35] Alfaro v. Comm’r.[36] After understanding the circumstances and concern of those responsible for this statute, he would add all that has been said and held by the Supreme Court and so many circuit courts nearly nine decades since the passage of the PSA, never changed by Congress. So informed, he could not expect a judge to interpret the statute by looking only at the bare words of § 192(a) and (b). Surely he would predict that the next court judgment would be consistent with the judgments of the other circuits.

Ruling

The order of the district court on the question presented was incorrect. To support a claim that a practice violates subsection (a) or (b) of § 192 there must be proof of injury, or likelihood of injury, to competition.

Appendix

Packers and Stockyards Act
7 U.S.C. § 192
§ 192. Unlawful practices enumerated
It shall be unlawful for any packer or swine contractor with respect to livestock, meats, meat food products, or livestock products in unmanufactured form, or for any live poultry dealer with respect to live poultry, to:
*364 (a) Engage in or use any unfair, unjustly discriminatory, or deceptive practice or device; or
(b) Make or give any undue or unreasonable preference or advantage to any particular person or locality in any respect, or subject any particular person or locality to any undue or unreasonable prejudice or disadvantage in any respect; or
(c) Sell or otherwise transfer to or for any other packer, swine contractor, or any live poultry dealer, or buy or otherwise receive from or for any other packer, swine contractor, or any live poultry dealer, any article for the purpose or with the effect of apportioning the supply between any such persons, if such apportionment has the tendency or effect of restraining commerce or of creating a monopoly; or
(d) Sell or otherwise transfer to or for any other person, or buy or otherwise receive from or for any other person, any article for the purpose or with the effect of manipulating or controlling prices, or of creating a monopoly in the acquisition of, buying, selling, or dealing in, any article, or of restraining commerce; or
(e) Engage in any course of business or do any act for the purpose or with the effect of manipulating or controlling prices, or of creating a monopoly in the acquisition of, buying, selling, or dealing in, any article, or of restraining commerce; or
(f) Conspire, combine, agree, or arrange with any other person (1) to apportion territory for carrying on business, or (2) to apportion purchases or sales of any article, or (3) to manipulate or control prices; or
(g) Conspire, combine, agree, or arrange with any other person to do, or aid or abet the doing of, any act made unlawful by subdivisions (a), (b), (c), (d), or (e) of this section.

. Pub.L. No. 67-51, 42 Stat. 159.

. 258 U.S. 495, 513, 42 S.Ct. 397, 401, 66 L.Ed. 735 (1922).

. Id. (citing Chicago Bd. of Trade v. United States, 246 U.S. 231, 238, 38 S.Ct. 242, 62 L.Ed. 683 (1918)).

. 258 U.S. at 513, 42 S.Ct. at 401.

. 196 U.S. 375, 25 S.Ct. 276, 49 L.Ed. 518 (1905).

. 258 U.S. at 520, 42 S.Ct. at 403.

. 105 F.2d 848 (7th Cir.1939).

. 286 F.2d 891 (7th Cir.1961).

. 308 F.2d 849 (7th Cir.1962).

. See Armour & Co. v. United States, 402 F.2d 712 (7th Cir.1968).

. 547 F.2d 367 (7th Cir.1976).

. 760 F.2d 211 (8th Cir.1985).

. 187 F.3d 974 (8th Cir.1999).

. 618 F.2d 1329 (9th Cir.1980).

. 495 F.3d 1217 (10th Cir.2007).

. 410 F.3d 1295, 1304 (11th Cir.2005).

. 420 F.3d 1272 (11th Cir.2005).

. No. 96-2542, 1998 WL 709324, 1998 U.S.App. Lexis 24630 (4th Cir. Oct. 5, 1998).

. See 61 Cong. Rbc. 1864-66 (statement of Rep. Voigt); see also Current Legislation, 22 Colum. L.Rev. 68, 68-69 (1922) (describing the efforts and effect the Big Five had on the interstate food markets).

. See 61 Cong. Rec. 1868 (statement of Rep. Voigt) (citing, inter alia, Report of the Federal Trade Commission on the Meat Packing Industry (1919)).

. Letter from the FTC to the President (as reprinted in H.R.Rep. No. 66-1297, at 23 (1921)).

. See Report of the Federal Trade Commission on the Meat Packing Industry (1919); see also Summary of the FTC Report 31-32 (as reprinted in H.R.Rep. No. 66-1297, at 24 (1921)) (stating that the monopoly of the Big Five “is not a casual agreement brought about by indirect and obscure methods, but a definite and positive conspiracy for the purpose of regulating purchases of live stock and controlling the price of meat ....”).

. See, e.g., Meat Packer: Hearing on H.R. 14, H.R. 232, HR. 5034, H.R. 5692 B4ore the H. Comm, on Agrie., 67th Cong. 246 (1921) (statement of Henry C. Wallace, Secretary of Agriculture) ("I believe in absolute, free competition. So far as you can do that by legislation I think it ought to be done[.]”); id. at 26 (statement of Rep. Anderson) (“What this bill seeks to do is prohibit the particular conditions under which monopoly is built up, and to prevent a monopoly in the first place and to induce healthy competition.”); see also 61 Cong. Rec. 1801 (1921) (statement of Rep. Haugen) (stating that “the matters to be dealt with [in the packing industry] are great questions of combinations and monopolies and methods and practices of unfair competition, usually of great magnitude and country wide in their effect”); 61 Cong. Rec. 1863 (statement of Rep. Voigt) ("While there is a large number of meat packers in this country doing an interstate business, it is understood that this legislation is aimed at the so-called Big Five packers [who have] as complete a monopoly of the meat packing business as it is possible for a man or set of men to acquire or that they could wish for.”); 61 Cong. Rec. 1880 (statement of Rep. Hudspeth) (stating "if I understand this bill, if it has any power at all, it puts in the hands of the Secretary of Agriculture power in preventing combinations putting up prices of meat on the hoof.”).

. See 61 Cong. Rec. 1888. (statement of Rep. Anderson). The predatory purchasing schemes Representative Anderson described involved packers purchasing goods and livestock at higher-than-market prices until competitors were driven out of business, followed by the packers immediately dropping the prices once the competitors had exited the market. See id. "Split shipments” involved “purchases, whereby, through the interchange of information, the split lots are made to sell at the same price on different markets regardless of how many packers are involved in marketing the purchase.” Methods of Meat Control Used by the Packers, As Set Forth by the Federal Trade Commission, N.Y. Times, Aug. 7, 1919. “Wiring on” involved a practice “whereby a shipper who forwards his live stock from one market to another for the purpose of securing a better price is punished regardless of which packer he sells to in the second market.” Id.; see also Stafford, 258 U.S. 495, 42 S.Ct. at 400, 66 L.Ed. 735.

. See Pub.L. 74-272, 49 Stat. 649 (1935); Pub.L. 85-909, § 1, 72 Stat. 1749 (1958); Pub.L. 94-410, § 3, 90 Stat. 1249 (1976); Poultry Producers Financial Protection Act of 1987, Pub.L. 100-173, § 3, 101 Stat. 917 (1987); Food, Agriculture, Conservation, and Trade Act Amendments of 1991, Pub.L. 102-237, § 1008, 105 Stat. 1818, 1898 (1991); Agriculture, Rural Development, Food and Drug Administration, and Related Agencies Appropriation Act of 2000, Pub.L. 106-78, § 912, 113 Stat. 1135, 1205 (1999); Farm Security and Rural Investment Act of 2002, Pub.L. 107-171, § 10502, 116 Stat. 134, 509 (2002).

. 540 U.S. 581, 593-94, 124 S.Ct. 1236, 1244-45, 157 L.Ed.2d 1094 (2004).

. See Meat Packer: Hearing On H.R. 14, H.R. 232, H.R. 5034, H.R. 5692 Before the H. Comm, on Agrie., 67th Cong. 246 (statement of Henry C. Wallace, Secretary of Agriculture).

. 7 U.S.C. § 193(a).

. 7 U.S.C. § 209.

. 402 F.2d at 722.

. Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

. London, 410 F.3d at 1304; Been, 495 F.3d at 1227.

. 546 U.S. 481, 486, 126 S.Ct. 1252, 1257, 163 L.Ed.2d 1079 (2006).

. Id.

. 579 F.3d 391, 399 n. 37 (5th Cir.2009).

. 349 F.3d 225, 229 (5th Cir.2003).